IN RE ESTATE OF ROBERTSON C. MARTIN.
SARAH WILLIAM MARTIN, APPELLANT, V. SARAH E. MARTIN ET AL., APPELLEES.

FILED NOVEMBER 25, 1922. No. 22404.

1. **Wills: REVOCATION BY IMPLICATION: DIVORCE.** A divorce and settlement between husband and wife, which agreement provides that the husband shall pay to the wife $2,500 as permanent alimony, *held* in legal effect to have foreclosed the claim of the wife to the property rights of the husband, and to have given rise to an implied revocation of his previously executed will.

2. ——: ——: REBUTTAL. When the circumstances are insufficient to show that an express reservation or understanding, preserving the will, entered into the agreement or settlement

between the parties, a showing of an affectionate attitude on the part of the husband toward the wife at the time of the divorce and settlement, or that he then had a mere intention that the will should stand, is insufficient as tending to rebut the implication that his will has been revoked.

3. ———: ———. Circumstances occurring after the revocation is presumed to have taken place cannot be resorted to as an aid to determine whether there has been, in fact, a revocation.

APPEAL from the district court for Douglas county: CHARLES A. GOSS, JUDGE. Affirmed.

Weaver & Giller and Atwood, Wickersham & Hill, for appellant.

William L. Dowling and Baker & Ready, contra.

Heard before LETTON, ROSE, ALDRICH, DAY and FLANSBURG, JJ., REDICK, District Judge.

FLANSBURG, J.

This was a proceeding, originally brought by Sarah William Martin in the county court of Douglas county, to probate the will of her deceased husband, under the terms of which she was sole beneficiary. The contestants are the father and mother of the deceased. In both the county court and on appeal in the district court, the probate of the will was disallowed on the ground that there had been a revocation implied by law, as a result of a divorce and property settlement had between proponent and her husband, subsequent to the execution of the will. Proponent brings an appeal here.

Sarah William Martin, the proponent, and Robertson C. Martin, the testator, were married in 1908, and made their home in Omaha. In the forepart of September, 1912, it appears that Mrs. Martin went to her mother's home at Montgomery, Alabama. The record does not show that there was, then, any domestic difficulty; nor that Mrs. Martin left her husband with the understanding that she was not to return; nor that a separation or severance of the bonds of matrimony was at that time

in the least contemplated. She does testify that after her departure at that time they never again lived together as husband and wife. But when their domestic difficulties began, or what they were, does not affirmatively appear. However, there is in evidence a letter, written by Mr. Martin to Mrs. Martin and mailed about two weeks after she left for Alabama, and in that there is no mention of any separation, nor any intimation of domestic difficulties; but, on the contrary, the letter is written in very endearing terms, as a letter between husband and wife where a happy relation exists and where nothing has come between them. With the letter was inclosed a copy of the will, which is now the subject of this action. It is argued by counsel for proponent that the record shows that the will was made after the parties had agreed to separate, and nad in fact separated, knowing that they could not live together longer as husband and wife. We do not believe the record bears out that fact. On the contrary, the record is entirely silent as to any domestic difficulties, or contemplated difficulties, existing between the husband and wife at the time of the execution of the will.

By the terms of the will Mrs. Martin was given all the property of the testator, including "a farm of 160 acres in Stanton county, Nebraska." Immediately after its execution, it was transmitted by the testator to the county judge of Douglas county, where it was placed on file. As has been said, a copy of this will was inclosed in the letter above mentioned and sent to Mrs. Martin, in Alabama.

It appears that Mrs. Martin, after her departure in 1912, continued to live with her mother; that her husband sent her a monthly allowance of from $50 to $60, and that the parties carried on a correspondence.

In the spring of 1914 Mr. Martin visited his wife at her mother's home, then in Nashville, Tennessee. At that time the record for the first time shows that a divorce was considered. On July 3, 1914, a decree of di-

vorce was entered in favor of the wife. Though no provision was made in the decree for alimony or a settlement of property rights, the parties did, on the same day, enter into a written agreement with one another, wherein it was recited that, whereas a divorce proceeding was pending and a decree would probably be entered, "the following agreement with reference to alimony is entered into:

"Robertson C. Martin shall pay to Sarah William Martin an aggregate sum of $2,500; $100 of which has heretofore been paid and the balance of which shall be paid at the rate of $50 a month upon the first of each and every month, commencing August 1, 1914, and continuing until the full amount of the balance of $2,400 has been paid, providing that if Sarah William Martin shall marry before the said full amount of the balance of $2,400 is paid, then and in such event the payments which have not accrued theretofore shall cease to be due and payable."

Mr. Martin was further required to pay attorney's fees and court costs, and to secure the $2,500 payment by a first mortgage on the 160-acre farm in Stanton county, or by a bond with satisfactory surety. Neither party remarried, and the payments provided for by this contract were made as had been promised. On June 24, 1920, Mr. Martin died.

By the agreement he was required to pay her $2,500. That was the amount which the parties agreed between themselves should be a sufficient total amount of permanent alimony. What relation that amount bore to the total value of his property, or what his earning power was, does not appear. The amount was no doubt arrived at after a consideration of the value of Mr. Martin's property and his ability to pay, and the agreement, though it does not expressly by its terms state that it is to be a full settlement of property rights, does have, in law, that effect. There was nothing in this agreement, nor in the record of the divorce proceeding, indicative of

In re Estate of Martin.

any reservations, which would show that the proponent's rights under the will were to be preserved or continued; on the other hand, the separation was complete and the accounting with one another full and comprehensive. The divorce and the agreement are sufficient to raise a clear presumption that the parties were for all time providing for a severance of their marriage tie, and for a complete settlement of all pecuniary obligations and property rights without any reservations. Under our decision in *In re Estate of Bartlett*, 108 Neb. 691, this change in circumstances, subsequent to the execution of the will, is sufficient to work a revocation of the will by implication of law.

It is contended by the proponent that the continued affection, as well as the positive declarations of the testator, subsequent to the divorce, shows that he had no actual intention of revoking the will, and that an implied revocation, if any, would have been by these facts destroyed. It appears from the testimony of Mrs. Smithson, proponent's mother, that in 1916 the testator, who, it appears, was a dealer in live stock, made a trip or two to Chicago, where proponent and her mother were then living, and that while there he called upon them; that for two or three days the three of them had dinner together and attended theaters. She testified that Mr. Martin had never lost his affection for his former wife, and that he, at that time, stated that he was worried about her health; that he told witness not to worry, that he would always take care of Sarah; that he had made a will and left her all of his property and that the will was filed in the courthouse in Omaha. Mrs. Smithson said she asked what his father would say, and that he replied that his father had nothing to do with it; that "They tell me he is a millionaire. * * * He is well off. His children are provided for, and I want to know that my wife is cared for;" that he said, "She is my wife, in the sight of God, and always will be," and stated that the reason he did not want his father to have his prop-

erty after his death was because "his father had given him as a boy, or a young man, that was just before he was of age, the awfulest whipping anybody ever gave a living mortal;" that witness said to testator, "You must forgive your father," and he replied, "I will try, but I never can forgive (forget) it."

It is the proponent's contention that the evidence shows that the testator had never, at any time, lost his affection for her, and that the statements made to her mother affirmatively show that he never intended that his will should be revoked, but rested firmly in the belief that he had provided for her and that she would so be taken care of.

When the circumstances are insufficient to show that an express reservation or understanding, preserving the will, entered into, the agreement or settlement between the parties, a showing of an affectionate attitude on the part of the husband towards the wife at the time of the divorce and settlement, or that he then had a mere intention that the will should stand, is incompetent as tending to rebut an implied revocation of his will. *Will of Battis*, 143 Wis. 234; *Wirth v. Wirth*, 149 Mich. 687; *Donaldson v. Hall*, 106 Minn. 502.

Circumstances occurring after the revocation is presumed to have taken place cannot be resorted to as an aid to determine whether there has been, in fact, a revocation. Declarations made by the testator after the divorce and settlement cannot, by reverting back, modify the effect of a state of facts which was at the time sufficient. To allow that to be done would indeed make unstable, if not utterly destroy, the rule itself. Where the acts, therefore, of the testator, subsequent to the occurrence of facts which work an implied revocation, are not sufficient, under our laws, to accomplish a republication of the will, we believe that the revocation must be held to stand.

The judgment of the lower court is therefore

ALDRICH, J., dissents.                    AFFIRMED.