## JOHNSTON v. LAIRD

(No. 1910; December 10, 1935; 52 Pac. (2d) 1219)

For the appellant there was a brief and oral arguments by *C. H. Harkins* and *D. J. Harkins,* of Worland.

For the respondent there was a brief and an oral argument by *Noel Morgan,* of Worland.

BLUME, Justice.

On August 17, 1912, William G. Johnston, hereinafter referred to as the testator, married Daisy Wilkinson, hereinafter referred to by that name. On August 5, 1918, the latter was adjudged insane and was committed to the insane asylum at Evanston, Wyoming, where she has remained ever since. On February 3, 1919, the testator made his will, which, aside from the signature and the clause signed by the witnesses, reads as follows:

"In the Name of God, Amen! I, William G. Johnston, being of sound mind and memory, but knowing the uncertainty of human life, do now make and publish this my last will and testament, that is to say: I give, devise and bequeath to my wife (Daisy W. Johnston), Evanston, Wyo. all my property both real and personal. I hereby nominate and appoint R. D. Gassner executor."

On July 2, 1920, the marriage between the testator and his then wife was annulled in an action brought by him on the ground that she was insane at the time of their marriage. The court in the decree awarded to Daisy Wilkinson the home in which she and her then husband had resided, as well as other real property situated in Worland, Wyoming, and the court further directed that the testator should pay to the guardian of Daisy Wilkinson the sum of $2000, and that "upon the payment of this sum the plaintiff William George Johnston be decreed to be free and clear from all claims by and on behalf of said Daisy Wilkinson of every nature and kind whatsoever." It is agreed between the parties that the sum of $2000 above mentioned was paid as directed by the court. On September 7, 1920, the testator and Winifred Johnston, hereinafter referred to as the widow of the deceased, were married, and this marriage subsisted until the death of the testator, which occurred on December 17,

1932. L. E. Laird, guardian of Daisy Wilkinson, filed the last will and testament above mentioned for record, to which the widow of the testator filed her objections, and on May 2, 1934, the trial court entered a decree sustaining the objections filed, and held that the last will and testament above mentioned was revoked by operation of law, due to the changed conditions and circumstances of the testator, and that the petition for the probate of the will above mentioned should be denied. From the decree entered accordingly the guardian of Daisy Wilkinson has appealed to this court.

1. There was no specific revocation of the will in question; if there was any, it was by implication. Chancellor Kent, in volume 4, 521, of his Commentaries, states that "there is not, perhaps, any code of civilized jurisprudence in which this doctrine of implied revocation does not exist and" is applied "when the occurrence of new social relations and moral duties raises a necessary presumption of a change of intention in the testator." And our statute (Sec. 88-105, Rev. St. 1931), after providing for specific methods of revocation, contemplates the application of the foregoing rule by stating "that nothing contained in this section shall prevent the revocation implied by law from subsequent changes in the condition or circumstances of the testator." The specific change of condition or circumstances which shall have that effect are not stated, but the statute doubtless contemplates that we should follow the provisions of Section 26-101, Rev. St. 1931, which states, in brief, that the common law of England, as modified by judicial decisions, and by statutes to the fourth year of James I (1607) shall be the rule of decision in this state when not inconsistent with the laws thereof. It is contended that marriage alone has the indicated effect, or if not, then at least in conjunction with the other changes shown in this case. We shall first direct our attention

to the fact of marriage alone. Implied revocation of a will was not recognized at common law up to and including the reign of James I. Overbury v. Overbury, 2 Show. 242, 89 Engl. Rep. 915, decided in the thirty-fourth year of Charles II (1694), seems to be the first decision relating to this subject. Johnston v. Johnston, 1 Phil. 447, 161 Eng. Repr. 1039. Hence we must decide this case in accordance with the decisions subsequent to the time of James I, in so far as not inconsistent with the laws of this state, and the decisions which must govern us, to the extent mentioned, are not only the English decisions commencing with the year 1694, but other decisions as well, comparatively recent though they may be, and we are at liberty to follow any of them, or rest our decision upon the fundamental principle underlying all of them. The first English decision, that of Overbury v. Overbury, supra, was, professedly, based on the Roman law. The pronouncements under that law extend no further than that the effect of the birth of a child, subsequent to the time of making a will, revokes it. The reason for that may be found in the social conditions of the time. Husband and wife were not, in classical and post-classical times, heirs of each other, except under very remote circumstances. Code Justinian 6, 18, 1. A wife generally brought a dowry to the marriage. That and the prenuptial gift, usually, and part of the time compulsorily, given her by her future husband, were considered sufficient security against poverty so far as the wife was concerned. No moral duty, accordingly, existed for the husband to make provision for her in his will, and if the existence of a new moral duty lies at the basis of implied revocation, as is generally assumed, it is clear that the Roman law does not prevent but rather permits the rule, under circumstances existing in this country, that a subsequent marriage is, under proper conditions, a proper ground

for implied revocation. Overbury v. Overbury, supra, went no further than the pronouncement found in the Roman law. Subsequent decisions considered various situations, at times holding that, under the facts, there was an implied revocation, at times not. A review of the English cases up to and including the early part of the nineteenth century may be found in Johnston v. Johnston, supra, and in Brush v. Wilkins, 4 Johns. Chan. 506 (1820). The only fundamental principle which we find underlying them all is that an intention of revocation may be implied, though not always, in the case of a man when new moral obligations not otherwise contemplated or provided for in the will, are subsequently imposed upon the testator. In the case of a woman, marriage alone revokes a will previously made, for at common law her existence was largely merged in that of her husband, and she, as a married person, could not make a will. In the case of a man, marriage and issue together were held to be sufficient, if the testator disposed of all of his property, without making provision for his offspring. We have found no case from England directly involving the question as to whether marriage alone would have that effect. Christopher v. Christopher, Dick. 445, 21 Engl. Rep. 343, decided in 1771, and Doe v. Barford, 4 Maule & S. 10, 105 Engl. Rep., decided in 1815, are sometimes cited as so holding. See 28 A. S. R. 559. But the first of these cases does not decide the point. In fact it was said by one of the judges that "I will not give any opinion what would be the consequence of a marriage only." In the second of these cases Lord Ellenborough, C. J., not supported by the other judges, stated: "Marriage, indeed, and the having of children where both those circumstances have concurred, has been deemed presumptive revocation, but it has not been shown that either of them singly is sufficient. I remember a case some years ago of a sailor who made

his will in favor of a woman with whom he cohabited, and afterwards went to the West Indies and married a woman of considerable substance, and it was held, notwithstanding the hardship of the case, that the will swept away from the widow every shilling of the property, for the birth of a child must necessarily concur in order to constitute an implied revocation." No case like that mentioned has been found in the reports, and was, if decided at all, probably decided by a trial court. The case in which Lord Ellenborough wrote an opinion merely involved the question as to whether a will made after marriage should be deemed revoked in favor of a posthumous child, and the ruling was in the negative, so that the statement above mentioned, relating to implied revocation by marriage alone, was *obiter dictum*. In fact, two years later, in 1817, in Johnston v. Johnston, supra, Sir John Nicholl was not at all sure that marriage alone was not, in some circumstances at least, such a change in condition as to operate as a revocation of a will, saying:

"Marriage alone may *possibly* stand upon a different foundation and footing from after born issue. Marriage is a civil contract; the wife may make her own conditions before marriage in order to provide against the negligence or injustice of the husband; marriage settlements are usual; the law out of the real property makes a provision for the wife by dower. If she enters into the contract and takes no precaution of this sort, she takes her chances either of the husband providing for her, or of providing for herself." (Italics are ours.)

The fact of dower alone was not, seemingly, sufficient, according to Sir John Nicholl, for the rule that a subsequent marriage alone does not revoke a will. And marriage settlements are not usual with us, nor can the fact that a wife can make her own contract before marriage have much bearing against the rule

contended for by respondent under the conditions existing in this country.

One of the first cases involving the point before us arising in the United States is Graves v. Sheldon, 1 Chipman (Vt.) 71, decided in 1824. The court held that marriage alone did not revoke a will on the ground that no alteration in the circumstances of the testator would in any case amount to revocation in law. That decision is, accordingly, no authority here. The opinion in Brush v. Wilkins, 5 Johns. Chan. 505, was written in 1820. Chancellor Kent stated:

"The disposition of property is and ought to be governed by settled rules, and * * * according to the language and authority of the general current of cases, there must be both marriage and a child, to work a revocation of a will."

The statement was *obiter dictum*, inasmuch as the question decided was that marriage and birth of issue revoked a will previously executed. Moreover, the opinion of the able chancellor would have more weight, if social and economic conditions of women had not undergone a revolution since his day. It was left to later decisions, and those comparatively recent, to decide that, according to the "common law," marriage alone does not revoke a will, when in fact there was no such common law rule, at least as understood in our statute, and when the only statements found in the reported cases tending in that direction were *obiter dicta* and were, moreover, limited in number. A majority of cases, it seems, follow the rule stated by Chancellor Kent. 68 C. J. 831. That, for instance, is true in Swan v. Hammond, 138 Mass. 45, and yet the court said in that case:

"Marriage alone in the case of a man or woman would seem to be a sufficient change in condition and circumstances to cause an implied revocation of a will previously made. A will made before marriage, and

taking effect after marriage, must take effect in a very different manner from that in the mind of the testator when the will was made. The rights of the husband or wife must greatly modify its provisions; and it can hardly be supposed that an unmarried person would make the same will he or she would make after marriage."

And so in Hulette v. Carey, 66 Minn. 327, 69 N. W. 31, 34 L. R. A. 384, the court, following the same rule, stated:

"There is a prevailing sentiment, often expressed by both courts and text writers, that marriage alone should be deemed such a change in condition and circumstances as will revoke a prior will. A statute to that effect was passed in England in 1837 (1 Vict. c. 26), followed by the enactment of statutes to the same effect in many of the states of the Union."

See also Schouler on Wills (5th Ed.) Sec. 424.

Strangely enough, the same courts have adhered to the rule that a woman's will is revoked by subsequent marriage (68 C. J. 831, 832 n. 90; 835 n. c.), notwithstanding the fact that under modern statutes, her common law disabilities have been largely or entirely removed, and husband and wife stand upon the same footing. We find, accordingly, an incongruous situation. If, in view of the equality of that condition, a woman's will is revoked by a subsequent marriage, the reason why that should be so in the case of a man is just as urgent, and in fact more so, and a holding to that effect would seem not to be contrary to any settled principle of the law of the past, but would seem to be required so as to harmonize with the statute. And the courts of five states have, in fact, in view of these changed conditions, come to that conclusion, at least in cases when no provision in the will to meet the subsequent events has been made. Brown v. Sherrer, 5 Colo. App. 255, 38 Pac. 427; In re Teopfer's Estate, 12 N. Mex. 372, 78 Pac. 53; 67 L. R. A. 315;

Morgan v. Ireland, 1 Idaho 786; Tyler v. Tyler, 19 Ill. 151; Byrd v. Surles, 77 N. C. 435; 68 C. J. 836. Some of them reason that at "common law," the arrival of an heir was such a change in a man's condition and circumstances as, in the absence of antenuptial agreement, or other provision, to revoke a will; that modern statutes make the wife an heir of her husband, and that the rule of the common law, has, accordingly, been fully met when a man marries after making a will—providing him not alone with a wife but an heir as well.

It is not, however, necessary herein to decide this case upon the fact of subsequent marriage alone. Other elements enter into it. There was here a final separation of the testator and Daisy Wilkinson, and a division of their property. There seems to be substantial unanimity among the courts dealing with the question, that when a divorce is coupled with a settlement of property rights between the parties, the change of circumstances is such as to impliedly revoke the husband's prior will. Lansing v. Haynes, 95 Mich. 16, 54 N. W. 699; Wirth v. Wirth, 149 Mich. 687; Donaldson v. Hall, 106 Minn. 502, 190 N. W. 972; 16 Am. & Eng. Ann. Cas. 541; Will of Battis, 143 Wisc. 234, 126 N. W. 9, 139 Am. St. Rep. 1101; In re Martin's Estate, 109 Nebr. 289, 190 N. W. 872; In re Bartlett's Estate, supra; Pardee v. Revis, 34 Oh. App. 474, 171 N. E. 375; In re Gilmour's Estate, 146 Misc. 113, 260 N. Y. S. 761; In re Morris' Estate, 22 Pa. Dist. Rep. 466. The rule was well stated in Lansing v. Haynes, supra, where the court said:

"By the decree of divorce in this case, the parties became as strangers to each other, and neither owed to the other any obligation or duty thereafter. There was, therefore, a complete change in these relations, within the language above quoted from Chancellor Kent. It is not, in my judgment, the natural presump-

tion that, after the testator had settled with her, had conveyed to her a good share of his property, and they, by agreement, had terminated all their property, as well as their marital, relations, the will executed nearly 10 years before should remain in force, and operate upon his death as a conveyance of the remainder of his property to her, to the exclusion of his heirs. If this were so, then it would follow that, if he had children living, or a dependent mother, or other dependent relatives, or a second wife without issue, his duties and obligations towards them must be set aside, in favor of a most harsh and unjust rule. The like result would follow where the husband had obtained a divorce from his wife on the ground of her adultery, and she had become a common prostitute; or where the wife had obtained a divorce for a like reason, or because her husband had committed a felony, for which he was incarcerated in prison. To hold the will unrevoked under these circumstances would be repugnant to that common sense and reason upon which law is based. I do not think the common law is so unbending as to lead to this result. 'The reason of the law is the essence and soul of the law.' "

The same thought, and in language equally strong, is expressed in the case of In re Will of Battis, supra.

We think that the reasoning of these cases is sound. The things which naturally prompt a man to make a will in favor of his wife are his regard and affection for her and the obligation which he may feel to provide for her comfort and support after he has gone. These elements cease to exist when the parties separate. The difference between a divorce and an annulment of marriage is too small for the application of a different principle of law. In fact, if Daisy Wilkinson was in fact insane when she married the testator, the latter's moral obligation to support her was even less than in a case of divorce. In the case of Morris' Estate, supra, there was no divorce, but merely an agreement of separation, and yet the change in the conditions and circumstances were thought to be such

as to bring the case within the rule that a prior will should be held to be revoked. And we think that there was a property-settlement. The title to real property given to Daisy Wilkinson by the decree stood, it is true, in her name. But it included the home which the parties had occupied, and in which, accordingly, the testator had an interest. And the wife received $2000 in addition, which evidently came out of the separate property of the husband. The combined property of the parties was small, and seems to have been about evenly divided between the parties.

It is further argued that the time between the making of the will and the death of the testator is so long that if he had intended to deprive Daisy Wilkinson of any of his bounty upon his decease he surely would have changed his will. But that point is, we think, fully answered in the case of In re Gilmour's Estate, supra, where the court said as follows:

"It is also urged on behalf of the proponent of the will that Theodore Gilmour must have remembered that he had made this will in favor of Florence, and that if he had not intended this will to prevail he would have destroyed it, or revoked it by executing another will. Would it not be more logical to believe that after his separation and his divorce, and his subsequent marriage, and after her subsequent marriage, if he still desired this will to control the disposition of his property, he would have published and redeclared the same, so that his intention could not be questioned? In his will, he gives his property to 'my wife, Florence Gilmour.' Is not it a fair assumption that he gave it to her in this will because she was his wife at that time? Might he not as well have said in his will, 'I give all my property to Florence Gilmour, because she is my wife, and because I love her and desire that she have my property for her support and happiness after I am gone?' The will, if it speaks at all, speaks from the date of death of the testator, and at that time she was not his wife."

In the case at bar there was not only a final separation of the testator and Daisy Wilkinson, but the testator subsequently married and lived with a second wife for the period of over twelve years. The estate which he left was small—so small in fact that it will not, by itself, keep the wolf from her door. The case before us presents stronger circumstances than any other within our knowledge, from which the intent to revoke the will should be implied. We do not hold that every new moral obligation has the effect of revocation. The rule is not as broad as that. It has its limitations. It depends on the circumstances. The circumstances in this case are such as to require the holding that the will involved herein, was revoked.

2. Appellant claims that the costs of this contest, including attorney's fees for appellant's attorney, should have been assessed against the estate, which the trial court refused to do, but which, in its discretion, it might have done under the provisions of Section 88-914, Rev. St. 1931. We do not think that the court abused its discretion. The estate of Daisy Wilkinson appears to be larger than that of the estate of the deceased, and counsel for appellant should rely for payment of his fees on the former. In fact, it seems that the estate of the deceased is hardly large enough to cover the amount of the exemptions which are by law allowed to the widow of the deceased. Under such facts it is enough that the estate of deceased pay its own costs and its own attorney.

The judgment herein must, accordingly, be affirmed and it is so ordered.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.