McCullum v. McKenzie.

Reversed.

McCULLUM v. McKENZIE *et al.*

Will: SUBSEQUENT BIRTH OF CHILD: IMPLIED REVOCATION. The birth of a child to a testator subsequent to the making of the will, and before the death of the testator, will alone operate as an implied revocation of the will. The state of the authorities upon this question, and the reasons for the rule herein announced, discussed by WRIGHT, J.

McCullum v. McKenzie.

*Appeal from Dubuque District Court.*

TUESDAY, FEBRUARY 2.

DEMURRER to petition sustained, and plaintiff appeals.

*A. Cragin* for the appellant.

*Wilson & Doud* for the appellee.

WRIGHT, J. — The petition shows that John McKenzie died in February, 1866, leaving defendant, Margaret, his WILL: subse- widow, and the other defendant, his only quent birth of child. child and heir-at-law. In April, 1851, the said John made his will, giving, among other legacies, to his sister Agnes the sum of $2,000. The child, Donald, was born in 1852, some eighteen months after the making of said will. The sister, Agnes, is dead, the plaintiff being her heir at law. The will undertook to dispose of all the testator's property — giving it to his sisters and wife — making no provision in any way for the child afterward born. Defendants disregarding the provisions of the will, have appropriated all the property, and refuse to pay plaintiff the sum to which he is entitled as the heir of said Agnes, etc.

The demurrer was upon the ground that the birth of the son, Donald, after the making of the will, operated in law to revoke the same, and that plaintiff, therefore, was entitled to nothing thereunder.

The question made is certain and single, presenting the simple inquiry whether the subsequent birth of the son, without any other fact or circumstances, operated to revoke this will.

In many of the States this question is settled by statute. Not so with us. Our law declares that *posthumous* children unprovided for by the father's will, shall inherit

the same interest as though no will had been made, to be taken ratably from the interests of heirs, devisees and legatees. Rev. §§ 2316–17. But, in this case, the child was born *before* the father's death, and there being nothing in the statute declaring what effect, if any, such birth, prior to the father's death and after the making of the will, shall have, we are left to determine it upon the common law.

The authorities are in conflict. Indeed, there is a strange want of authority upon the precise question involved. The great controversy in the early history of the ecclesiastical courts, was whether subsequent marriage and the birth of a child would operate to revoke, first, as to personalty, then, as to realty.

It was finally very conclusively settled, that a revocation would follow these two facts or events. Some of the cases, perhaps, say that marriage alone will not have this effect, while more state the rule that birth will not. But it is astonishing how often it occurs that the latter proposition is announced in cases where it was entirely unnecessary to pass upon the question. A striking instance of this is found in the leading case in this country of *Brush* v. *Wilkins* (4 Johns. Ch. 506). And Mr. Redfield, in his chapter (Wills, 7, pp. 292–302) on revocation by marriage, etc., cites this same case, and says, " it seems that a subsequent birth of a child will not amount to a revocation." And so, too, Mr. Kent (4 Com. 523), in laying down the same rule, says " the better opinion is that under the English law," etc. And yet, after all, there is very little decided, very little of authority, which can be said to really and actually support this so-styled " better opinion." We nevertheless incline to the belief, that a majority of the cases, or rather of opinions and dicta expressed by judges, when the question did, and did not, arise, are in favor of the rule announced or recognized in

*Brush* v. *Wilkins, supra.* And still we cannot resist the conviction that courts have been struggling, gradually but certainly, to an opposite result.

As already suggested, this question is settled by positive statute in many, and, we may add, most of the States. The rule of the civil law was, that the subsequent birth was such a change in the domestic relations of the testator, as to constitute an implied revocation. The statutes adopt, almost uniformly, the rule of the civil law, declaring the revocation following to be either partial or total. And thus, we have another instance (and many of them are found in the legislation of the States) of how apt we are to adopt the rules of the civil law in matters relating to the descent of property, the construction of wills, and the settlement of estates. This legislation attests the struggle to which we have referred, and the conviction of the popular and legislative will, that the so-called rule of the common law was unjust, harsh, and inconsistent with the rights of children; frequently, if not uniformly, defeating the will and purpose of a father. In this country, all the children, by our laws of descent, are substituted for the sole heir. This is the policy of this, and we believe, all the States. The common law heir was not to be disinherited, except by express devise, or by implication so unmistakable that an intention to the contrary could not be supposed. 1 Powell on Dev. 199; *Allen's Exr.* v. *Allen,* 19 How. 385; *Bradford* v. *Same,* 6 Whart. 244. All the children here stand in the place of one common law heir, and as this question went to his birthright, so it does now to theirs, and the same considerations should obtain when it is sought to disinherit them.

It is in accordance with the uniform, if not universal observation of all, that a parent of sound mind, when left to the exercise of his own judgment, never does, without

the most cogent and weighty reasons — such as the gross ingratitude of a child — by his will withhold from any one of his children their due and reasonable share of his estate. If, by possibility, an instance of the kind should occur, we hesitate not to say, it would strike every unprejudiced man as unnatural, harsh, cruel and unjust. And particularly would this be true, where, as in this instance, the child was not in being at the time of making the will. Certainly, as to a child born, as this one was, eighteen months after the testamentary act, there could be no intention to disinherit. And, surely, we need not say that the birth of this child instantly created new duties and obligations; worked such a change in the father's domestic relations as to necessarily, properly, and most reasonably influence and sway his affections and conduct, and, we may add, legally operate to presumptively change his intention, in the disposition of his property, as expressed in his will. Upon this ground it was that the civil law based the rule, rather than upon a tacit condition annexed to the instrument; and the ground strikes us as being in accord with the experience of men everywhere; in harmony with the real and actual *will and purpose* of the father, and in a very large majority of, if not in all cases, with the rule as settled by the legislation of this country; and it certainly is not without support in the authorities. We shall quote but from one of the cases, contenting ourselves with citing others.

In *Sneed* v. *Ewing and Wife*, 5 J. J. Marsh. 472, the chief justice (ROBERTSON), after speaking of implied revocation, and the principle upon which it is founded, uses this language: " Some authorities require both marriage and the birth of the child; others admit either the one or the other to be sufficient. So far as the statute of this State can operate, the birth of a child may alone amount to an implied revocation of a prior will. This

statute is, in our opinion, in accord with pre-existing law, and is only declaratory of it. Reason and principle, as well as a preponderance of authority, repudiate the notion that both marriage and issue are indispensable to an implied revocation. (See the masterly argument of Fonblanque, in vol. 2, note *b*.) This argument of the distinguished annotator is as conclusive as reason can make it; and although it may be opposed by a numerical majority of decisions and *dicta*, it is sustained by a decided preponderance of authority and by acknowledged principle. We, therefore, concur with Fonblanque, and shall not now discuss a question we consider as settled by such satisfactory and luminous reasoning." Upon a question even doubtful upon authority, as this is conceded to be, we should not be far wrong in following a judge, speaking for a court so able, as that which he so fitly represented. But we cite further as bearing upon and supporting the same view. *Young's Appeal*, 39 Pa. 115; *Haskins* v. *Speller*, 1 Dana, 170; *Ash* v. *Ash*, 9 Ohio, 383; *Edward's Appeal*, 47 Pa. 144; *Bloomer* v. *Bloomer*, 2 Bradf. (N. Y.) 339; *Johnson* v. *Same*, 1 Phill. 449.

The order sustaining the demurrer is

Affirmed.