ROBERT HORATIO BURNS,

*Plaintiff and Appellant,*

vs.

CLARA D. BURNS, Executrix of the Estate of Horatio Burns, Deceased, CLARA D. BURNS, NANCY P. BROOKS, DOROTHY M. BURNS and RUTH C. HUTTON,

*Defendants and Respondents.*

(No. 2460; November 21, 1950; 224 Pac. (2d) 178)

316

For the plaintiff and appellant the cause was submitted upon the brief of Raper and Raper of Sheridan, Wyoming, and oral argument by Mr. John F. Raper.

For the defendants and respondents the cause was submitted upon the brief and also oral argument by Mr. Jack Wolfe of Sheridan, Wyoming.

## OPINION

BLUME, Justice.

This is an action brought by Robert Horatio Burns, hereinafter called the plaintiff or appellant, against Clara D. Burns, surviving widow of Horatio Burns and his three daughters, namely, Nancy P. Brooks, Dorothy M. Burns and Ruth C. Hutton, in which he asks that he be allowed an equal share in the estate of the deceased with the three daughters.

The amended and supplemental petition alleges in substance as follows: Plaintiff is the son of Horatio Burns, deceased, who died on November 15, 1946 at Sheridan, Wyoming; that the deceased left a will, admitted to probate December 30, 1946. In that will de-

ceased left to his wife Clara D. Burns, the North one-half (N½) of the Southwest quarter (SW¼) and the South one-half (S½) of the Northwest quarter (NW¼) of Section No. Eight (8) in Township No. Fifty-six (56) North of Range No. Eighty-three (83) West of the Sixth Principal Meridian. He left all the balance and remainder of his estate equally to the three daughters above mentioned. The estate of the deceased is in the course of administration and petition for distribution was filed on November 23, 1948. All of the estate will be distributed to the defendants unless the executrix, namely, the surviving widow of the estate is enjoined by the court. The estate should not be thus distributed for the reason that the plaintiff was not named in the last will and testament of the deceased, the plaintiff having been born on January 2, 1905 and not having been provided for in the will. Plaintiff is a pretermitted child of the deceased and is entitled to a share and share alike distribution along with the devisees and legatees named in the will. Notice of final settlement has been given notifying all parties interested that they should file objections thereto on the 3rd day of December, 1948. On December 1, 1948 plaintiff filed his objections to the distribution of the estate as mentioned in the petition for distribution and notice thereof. A motion was filed by the executrix of the estate to strike the objections from the files. Such motion to strike was sustained by the court. The action of the court was wrongful and erroneous for the reasons heretofore mentioned. The deceased left real estate (describing it) which was appraised at the sum of $24,891.30. (The specific land devised to the widow is not shown to be among the lands still owned by deceased.) He also left personal property appraised at $90,446.01. Plaintiff brings this action in equity to have his interest in the real property and the personal property determined as a pretermitted child. The de-

ceased never executed a new will after the birth of the plaintiff because he believed that the plaintiff herein had a legal right to share in his estate along with his other children and it was the expressed intention of the deceased for the plaintiff to have an equal share of his estate with his other children.

WHEREFORE, plaintiff prays that the executrix of the estate be directed to pay over to the plaintiff a share of the estate of the deceased equal to that to be received by each of the daughters of the deceased, and that he be decreed the owner in fee simple of an undivided one-fourth interest in and to all real estate left by the deceased. A copy of the objections to final account and petition for distribution is attached.

On January 11, 1949, the defendants filed a demurrer to the amended and supplemental petition on the grounds: 1. That the court has no jurisdiction of the subject of the action. 2. That the said petition does not state facts sufficient to constitute a cause of action. 3. That it is apparent upon the face of plaintiff's amended and supplemental petition that the purported cause of action is barred by the limitations set forth in Section 6-408 and Section 6-414, Wyo. Comp. St. 1945. 4. That any purported rights of pretermitted children are preterlegal in the State of Wyoming. On April 26, 1949 the court sustained the demurrer and the plaintiff not answering further, judgment was entered in favor of the defendants on the 20th day of June, 1949.

The demurrer admits the truth of the facts alleged in the amended and supplemental petition. 49 C. J. 434. Counsel for the defendants in his brief filed in this court as well as on oral argument (over the objection of appellant) attempted to interject into the case facts that do not appear in the amended and supplemental peti-

tion. These facts so attempted to be interjected into the case are not a part of the record before us and cannot, of course, be considered. If counsel wanted to have facts considered other than those alleged in the pleading of the plaintiff, he should not have filed a demurrer but should have filed an answer, and thus should have developed all of the facts which he wanted the appellate court to consider on appeal.

The question to be determined herein, is as to whether or not the plaintiff, as a pretermitted child, born after the execution of the will of the deceased, is, under the allegations of the amended and supplemental petition entitled to any share in the estate of the deceased. It has often been said that our ideas as to revocation of a will by reason of subsequent changes in family and domestic relations were derived from the Roman, or civil law, and we have been referred to that law by counsel for appellant as authority for their contention herein. So we have deemed it proper to set out that law somewhat more in detail than we ordinarily find in the decisions. And in view of the fact that the common law took into consideration and modern statutes take into consideration marriage as well as birth of subsequent children, it may not be amiss to consider both of these factors in the Roman law, in order to get a more complete perspective of the likeness or difference between that law and the common law and modern statutes in connection with the revocation or annulment of a will or testament by reason of changes as above mentioned.

And first, let us consider the matter of marriage in broad outline. There was no such rule in the Roman law that marriage alone, or marriage plus the birth of a child revoked a will. During all of the classical or post classical Roman law, when marriages were free—that is when the woman was not under the so-called domination (potestas) of her husband—the marriage

of a man had no revocatory effect whatever on his testament insofar as the disposition of the property which was his was concerned. It was the custom for a woman who was to be married to bring to her husband a dowry, provided by herself, or her father or some other party, which should serve as part of a common fund to provide for the support of the family. During the time of the empire a custom arose, under the influence of the customary practice of the Orient, for the husband to give to the wife a prenuptial gift, equal in amount to the dowry brought by the wife. This gift was later allowed to be made even after marriage. Both the dowry and the prenuptial or postnuptial gift were under the control of the husband during the marriage, but became the absolute property of the wife upon the death of her husband. But that was all the right she had. She had no rights whatever in the separate property of her husband, whereas under the common law, she had at least the right of dower in the real estate of her husband. Buckland, Textbook of Roman Law (2d Ed.) 107-111, 19 C. J. 498, Sec. 116. It was not until 537 A. D. that Justinian enacted a law providing for a wife who had brought no dowry to the marriage. By Novel (new law) 53, Chapter 6 he provided: "The law is founded upon justice. We notice, however that some men have married women without a dowry, then die and the children inherit his property according to law. But the women who have been the legal wives till the death of the husband, receives nothing because neither a dowry nor a prenuptial gift was given, and hence live in extreme poverty. We therefore ordain that the wife shall be protected by the property left by the decedent and shall share therein with the children * * * she shall receive a fourth of his property whether there are many or few children. * * * To be sure, the provision as to the fourth part shall * * * equally apply to husbands * * *. We have made the provisions however only for cases where

one or the other of the spouses, husband or wife, who gave neither dowry nor prenuptial gift are in want * * *. If the survivor should perchance be rich, it would not be just that he or she who gave no such dowry or prenuptial gift should be a burden on the children." By Novel, 117 Chapter 5, enacted in 542 A. D. the fourth above mentioned was limited to 100 aurei, which apparently, under the gold standard of today, amounted to approximately $4000.00.

And next as to pretermitted children. In McCullum vs. McKenzie, 26 Iowa 510, it was said that "the rule of the civil law was that the subsequent birth (of a child) was such a change in the domestic relations of the testator as to constitute an implied revocation" of his will. See also Negus vs. Negus, 46 Iowa 487, Bloomer vs. Bloomer, 2 Bradf. (N.Y.) 339. The statement is but a half-truth. There was no special rule applicable to after-born children. There was a general rule applicable to all children alike that a testator in order to exclude any children from benefit under his will—we do not here need to consider others—was required to disinherit them under the terms of the will. To pretermit them was fatal to the will. Thus Gaius, writing in the second half of the second century of our era states in II, Sec. 123, etc.: "Again, he who has a son in power must take care either to appoint him heir, or to exclude him by name, otherwise if he should pass him over in silence, the testament will be of no effect; * * * if a son is disinherited by his father, he must be disinherited by name, (expressly) * * *. Other children, whether of the male or female sex, are sufficiently disinherited by being included amongst the rest, that is, in these words—'Let all the rest be disinherited' ". Again in II, Section 130, etc. he states: "Posthumous children ought to be either appointed heirs or excluded. And the condition of all such children is equal in this, that if a posthumous son, or any posthumous male or female

descendant, is passed over, the testament is * * * revoked * * * and for that reason it becomes invalid." The term "posthumous children" (postumi) was used in two different senses by the writers and included not only children who were "posthumous" in the sense as we use it, but also children who were born after the execution of a testament—Heumann-Seckel Lexicon. See also the notes of Moyle, pages 247-248 and Sanders pages 180-185 in their editions of the Institutes of Justinian, and the notes of Poste in his edition of Gaius, pages 222-224. And there is no doubt that children born before or after the execution of a testament stood on exactly the same footing insofar as the annulment of the testator's will is concerned, if either of them were pretermitted. Justinian in II, 13 of his Institutes in the early part of the 6th century of our era, restated substantially the rules stated by Gaius on the subject before us. When we bear in mind that so far as pretermission is concerned, there was under the Roman law absolute equality between children born before and those born after the making of a will, and we further bear in mind that under the common law, the testator had at least the right, as we shall see, to pretermit or disinherit a child already born at the time of the execution of his will, it is readily seen that the Roman law is not much help to us in solving the particular problem before us. On principle and speaking generally, there is no more moral right to pretermit or disinherit a child already born than it is to do the same thing as to an after-born child, and if we were to translate the rule of equality of the Roman law, and adopt it, to that of the common law, we should have to say that a testator may pretermit or disinherit an after-born child just as he has that right in connection with children already born.

Morever it may be—though it is not certain—that for a time at least a testator had under the Roman law the

right to disinherit a child, no matter when born, provided it was done in the manner required by law—expressly or by name in the case of sons, by general terms in the case of daughters. Gaius II, 123, 128. But the time came when that right was limited, and exclusion gave rise to a complaint that the testament was unjust (querella inofficiosi). That complaint is not mentioned by Gaius, so that it would seem that in his time the law on the subject was not yet perhaps fully developed. The rule came to be that a testator was bound, except for just cause, to leave to any child one-fourth of an inheritance of what he or she would have received on intestacy. So that in the case of four children (the number in the case at bar) the testator was required to leave to each of them the 1/16th part of the inheritance. If a portion of this fourth were left, only an action to supply the deficiency lay. In case there were no children or grandchildren, the right of complaint was vested in other relatives. Justinian, Institutes 2, 18, 3 and 6. Code Justinian 3, 28, 8 and 31; 3, 29, 2; D, 5, 2, 8, 6 and 8, Hunter Roman Law (4th Ed) 780-786, Buckland, supra, 327-331. The one fourth above mentioned necessary to be left was increased by Justinian, namely to one third if there were four children or less, and one half if there were more than four children. Nov. 18, 1, Buckland, supra, page 329. Other facts in this connection need not be mentioned.

It would seem that under the later civil law, the rule in the various countries was not uniform. In France, it seems, the birth of a child subsequent to the execution of a will did not invalidate it; but it was invalidated under the Louisiana law, apparently adopted from the Spanish law. See Succession of Senac, 2 Robinson (La.) 258.

It is not improbable that the general thought that a testator should provide for his offspring came to the

common law, via the ecclesiastical courts, from the Roman law, but, as will be seen hereafter the specific rules on the subject adopted by the common law were quite different from those of the Roman law. Even modern statutes on the subject not only differ from the Roman law, but differ from each other. See Annotation 152 A. L. R. 724. See also note 29 Columbia L. R. 750, 5 Wisconsin L. R. 388-389.

We adopted the common law. By Section 16-301, Wyo. Comp. St. 1945, it is provided that: "The common law of England as modified by judicial decisions, so far as the same is of a general nature and not inapplicable, and all declaratory or remedial acts or statutes made in aid of, or to supply the defects of the common law prior to the fourth year of James the first (1607 A.D.) * * *, shall be the rule of decision in this state" etc. At the time of James the first there seem to have been no judicial decisions, or any enactments relating to the specific subject before us, so that our starting point herin must be found in something else, and that is in the power of disposition of property by a testator. It is not necessary to refer to early rules and customs. The history thereof has been ably stated in Holdsworth History of English law, 1 Page on Wills (Lifetime Edition) page 15, and subsequent pages, 57 Am. Juris. 41-42 and other authorities. We may take our start from the statute of Wills enacted in 1540 A. D. (See Page, supra, pages 43-44 and note). That statute conferred, with some restrictions "full and free liberty, power and authority to give, dispose, will and devise as well by last will and testament in writing or otherwise by any act or acts lawfully executed in his life, all his said manors, lands, tenements or hereditaments, or any of them, at his free will and pleasure." And the rule is recognized that generally speaking a man of sound and disposing mind may bequeath and devise his property as he pleases, subject of course to statutory

provisions which limit that power. 68 C. J. 609, 57 Am. Juris. 134-135, In Re Alburger's Estate, 274 Pa. 10, 117 Atl. 450, Harris vs. Schoonmaker, 50 Wyo. 119, 58 P. 2d 415, Watts vs. Farmer and Jensen, 63 Wyo. 332, 344, 181 P. 2d 611, 4 Kent Comm. 524. In Parker vs. Foreman, 252 Ala. 77, 39 So. 2d 574, it was held that a statute in derogation of the general power to make a will should be strictly construed. To the same effect is In Re Alburger's Estate, 274 Pa. 10, 117 Atl. 450. It may be that the court overstated the matter when it said in Wogan vs. Small, 11 Serg. & R. (Pa.) 141 as follows: "* * * it is better that individuals should be distressed, than the freedom of disposition by last will, invaded; that freedom which is one of the greatest excitements to enterprise and industry. Once establish the judicial habit of examining the situation of a man's fortune or family, and revoking his will, because he has made an absurd, or an inhuman disposition of his property, or because we may suppose he was ignorant of the state of his affairs, or of the law, and no man's will is safe." We must also bear in mind that revocation of wills by implication is not favored. In Re Adler's Estate, 52 Wash. 539, 100 P. 1019, 1023, In Re Hall's Estate, 159 Wash. 236, 292 P. 401, In Re Walter's Estate, 60 Nev. 172, 104 P. 2d 968, In Re Arnold's Estate, 60 Nev. 376, 110 P. 2d 204, Robertson vs. Jones, 345 Mo. 828, 136 S. W. 2d 278, Neibling vs. Orphan's Home, 315 Mo. 578, 588, 286 S. W. 58, 51 A. L. R. 639, Wogan vs. Small, 11 Serg. & R. (Pa.) 141, Williams vs. Miles, 68 Neb. 463, 94 N. W. 705, 110 A. S. R. 431. It is clear that this rule harmonizes with, or enforces, the right of freedom of testamentary disposition. And that right, too, is emphasized by the statutes of many states—at least 16 in number, see Annotation in 65 A. L. R. 472—which provide that children not provided for in a will shall nevertheless inherit, unless it appears that the omission was intentional and not occasioned by

accident or mistake. Thus the right to disinherit them is clear. All that is necessary is to show the intention to do so. In view of the foregoing rules it has been held, as hereafter noted, that "the intention to revoke must be plain and without doubt." See also In Re Bartlett's Estate, 108 Neb. 681, 189 N. W. 390, 25 A. L. R. 39. Hence it is clear that we should proceed with caution in holding the will in this case to be revoked. We have no statute expressly providing, as many statutes do, that the birth of a child subsequent to the execution of a will shall revoke it. So we see no escape from the fact that we must resort to the rule of the common law as directed by our statute. It is stated in a note to 29 Columbia L. R., page 749, that only this state, Florida, and Maryland lack a direct statute on the subject.

Counsel for appellant seem to argue that we should adopt a rule in conformity with modern statutes on the subject. These statutes vary a great deal. See Annotation 152 A. L. R. 723, 29 Columbia L. R. 748-786. It is true that the rule of stare decisis should not be rigid and we have frequently said that the law is a developing science. And in conformity with that we decided the case of Johnson vs. Laird, 48 Wyo. 532, 52, P. 2d 1219, holding that a will in favor of a wife was revoked, when the marriage was annulled and a property settlement has been made. In the case of Naab vs. Smith, 55 Wyo. 181, 97 P. 2d 677, we held that a woman's will is not revoked by her marriage as was true at common law. Must we go further? Despite the provision of our legislature in Section 16-301, supra, we seem to be frequently asked to ignore and emasculate the rules of the common law. Whether to do so or not is not always easily determined. It would not be permissible if to do so would be clear and deliberate legislation, the power of which has been delegated to another department of our government. So far as the moral duty of a parent

to take care of his offspring is concerned, that has not changed since the adoption of common law rules. That duty is just as great and no greater than it was a century ago or two or 20 centuries ago, so that such moral duty could hardly in the absence of a statute furnish a basis for abandoning the common law rule. It was said in the case of In Re Hulett's Estate, 66 Minn. 327, 69 N. W. 31, which involved a case of revocation of a will: "It is undoubtedly true that many of the doctrines of the common law had their origin in social and political conditions which have in whole or in part ceased to exist. But this fact alone will not usually justify courts in holding that these doctrines, when once thoroughly established, have been abrogated, any more than it would justify them in holding that a statute has been abrogated because the reason for its enactment has ceased. Any such rule would leave the body of the common law very much emasculated; as, for example, that pertaining to real estate. While, undoubtedly, the common law consists of a body of principles applicable to new instances as they arise, and not of inflexible cast-iron rules, yet where the rules of the common law have become unsuited to changed conditions, political, social, or economic, it is the province of the legislature, and not of the courts, to modify them."

The only statutory provision which has a direct bearing on the point herein is Section 6-306, Wyo. Comp. St. 1945, which provides as follows: "No will or any part thereof shall be revoked unless by burning, tearing, cancelling or obliterating the same with the intention of revoking it, by the testator or by some person in his presence and by his direction, or by some other will or codicil in writing, signed, attested and subscribed in the manner provided by law for the execution of a will, excepting only that nothing contained in this section shall prevent the revocation implied by law from subsequent changes in the condition or circumstances of the

testator. The power to make a will implies the power to revoke the same." The first part of the section is modeled after an act of England relating to the statute of frauds enacted in 1676 in the 29th year of Charles, II, Chapter 3, and which in Section 6 thereof provided as follows: "All devises and bequests of lands and tenements shall remain and continue in force, until the same be burned, cancelled, torn or obliterated by the testator, or his directions, in manner aforesaid, or unless the same be altered by some other will or codicil in writing, or other writing, of the devisor, signed in the presence of three or four witnesses, declaring the same; any former law or usage to the contrary notwithstanding."

Despite this explicit statutory declaration, the courts gradually came to hold that when a testator disposed of all of his property by will, marriage plus the birth of a child revoked it. Lord Mansfield in Brady vs. Cubitt, 1 Dougl. 31, 99 Engl. Rep. 24, held that the doctrine should rest on the presumption that the testator intended to revoke his will. And so it was said in the late case of In Re Arnold's Estate, 60 Nev. 376, 110 P. 2d 204, quoting from a Nebraska case: "The doctrine of revocation by implication of law is based upon a presumed alteration of intention arising from the changed condition and circumstances of the testator, or on the presumption that the will would have been different had it been executed under the altered circumstances." See also 4 Kent, Comm. 521-2. It was held by Lord Mansfield that the presumption might be rebutted even by parol evidence to the contrary. But the rule in a case in which there was a marriage plus issue after the execution of a will came to be so hardened into a fast and definite rule, that it was held that in such case the will should be held to be executed upon a tacit condition that it should be deemed revoked when the condition arose; to express it otherwise, that the presumption in

such case should be deemed to be conclusive without reference to the intention of the testator. 68 C. J. 829. It was so held by Lord Kenyon in Doe vs. Lancashire, 5 T. R. 50, 101 Engl. Rep. 28 and Marston vs. Roe, 8 Adol. & E. 14, 112 Engl. Rep. 742. The same view was intimated by Lord Ellenborough in Kenebel vs. Scrafton, 2 East 530, 102 Engl. Rep. 472, decided in 1802, subject however to the limitation that no provisions for the wife and child had been made. See also Israell vs. Rodon, 2 Moore P. C. 51, 12 Engl. Rep. 922. The rule was extended in this country to a case where a man was divorced and a settlement of property rights was made. In Re George W. Hall's Estate, 106 Minn, 502, 119 N. W. 219, 20 L. R. A. N.S. 1073. So it could be applied in the case of Johnston vs. Laird, 48 Wyo. 532, 52 P. 2d 1219, already mentioned, and similar cases. But it was not applied to a case like that at bar. (See Doe vs. Barford, infra.) And it is clear, of course, that we cannot apply it in this case, unless we are prepared to hold—as we are not—that under the common law "as modified by judicial decisions," (section 16-301 of our statute, supra) the birth of a child subsequent to the execution of a will does in all cases revoke a will as a matter of law without reference to other circumstances. A number of cases consider the intention of the testator as the fundamental factor to be considered in determining whether or not he should be presumed to have revoked it, and that the presumption should be based on the facts and circumstances appearing in the particular case. Gibbens vs. Cross, 2 Add. 455, 162 Engl. Rep. 361 (1825), Sherry vs. Lozier, 1 Bradf. (N.Y.) 437, 453, Wogan vs. Small, 11 Serg. & R. (Pa.) 141, Wheeler vs. Wheeler, 1 R. I. 364, In Re Alburger's Estate, 274 Pa. 10, 117 Atl. 450, Allen vs. Heron, 157 Fed. 2d 707, Havens vs. Van Den Burgh, 1 Denio (N.Y.) 27, Brady vs. Cubitt, 1 Dougl. 31, 99 Engl. Rep. 24, Johnston vs. Johnston, 1 Phillimore 447, 161

Engl. Rep. 1039, 69 C. J. 825, note 26. That would seem to be the rule applicable in the case at bar. See discussion on this subject in 1 Page on Wills (Lifetime Edition) Sections 508-509. It may be of interest to note that in writing about pretermitted heirs in 29 Columbia L. R. 748, etc., and speaking of the "typical statute," the author states on page 750 : "It is a statutory revival of the old common law theory of so-called revocation by circumstances on the basis of presumed intent, applied to a situation not within the common law rule. On the contrary, that it is not an embodiment of the later theory of 'tacit condition' independent of intent, is evident from the prominence and effectiveness given an intent to disinherit under these statutes."

In England, the rule was firmly established that the fact of the birth of a child alone subsequent to the execution of the will, unaccompanied by other circumstances, did not revoke it. Shepherd vs. Shepherd, 5 T. R. 51, 101 Engl. Rep. 29 (citing a number of previous cases) Doe vs. Barford, 4 M. & S. 10, 105 Engl. Rep. 739 (1815), Johnston vs. Johnston, supra, (mentioned again later). In Doe vs. Barford, supra, Lord Ellenborough said : "The argument seems to be, that because the testator, had he known his situation, ought to have revoked his will, therefore the law will impliedly revoke it. But if it is to be understood that every will is made upon a tacit condition that it shall stand revoked whenever the testator by the circumstance of the birth of a child becomes morally bound to provide for it, I do not see why the birth of any one of a numerous succession of children would not equally work a revocation. But where are we to stop? Is the rule to vary with every change which constitutes a new situation giving rise to new moral duties on the part of the parent? Marriage, indeed, and the having of children, where both those circumstances have concurred, has been deemed a presumptive revocation, but it has not been

shewn that either of them singly is sufficient. I remember a case some years ago of a sailor who made his will in favour of a woman with whom he cohabited, and afterwards went to the West Indies and married a woman of considerable substance; and it was held, notwithstanding the hardship of the case, that the will swept away from the widow every shilling of the property; for the birth of a child must necessarily concur in order to constitute an implied revocation. In Doe vs. Lancashire it was adjudged that marriage and the pregnancy of the wife with the knowledge of the husband, and the subsequent birth of a posthumous child, came within the rule, the same as if the child had been born during the parent's life. In this case it is desired of us to extend the rule a step farther, but I own I am afraid of so doing." In Parsons vs. Lance, 1 Ves. Sr. 189, 191, the chancellor stated: "There may be good reason in the difference taken between the marrying, and having children after the making the will (which is a total alteration of circumstances) and the having children only when married before; in which case the testator is presumed to suppose that by possibility, his wife may have children; which event is before his eyes at the time of making the will." The foregoing rule was followed or recognized in the absence of a statute in this country. 68 C. J. 840, In Re Kraston's Estate, 58 N. Y. S. 2d 364, Wormser vs. Croce, 120 App. Div. 287, 104 N. Y. S. 1090, Smith vs. Robertson, 24 Hun. 210 (N.Y.), Marshall vs. Marshall, 25 Tenn. App. 309, 156 S. W. 2d 449, In Re Darrow's Estate, 31 Erie 381 (Pa.), M'Cay vs. M'Cay, 5 N. C. 447, Yerby vs. Yerby, 3 Call (Va.) 357, Savage vs. Mears, 2 Rob. (Va.) 570, Ellis' Exrs. vs. Ellis' widow, 2 Des. (S.C.), 556, In Re Hatfield's Estate, 153 Fla. 817, 16 So. 2d 57, Easterlin vs. Easterlin, 62 Fla. 468, 56 So. 688, 29 Ann. Cas. 1913D, 1316, Ordish vs. McDermott, 2 Redf. (N.Y.) 460, In Re Rendall's Estate, 244 Mich. 197, 221 N. W. 116, In Re Allen's

Estate, 64 Fed. Supp. 107, Allen vs. Heron, 157 Fed. 2d 707. In 29 Ann. Cas. 1913D, page 1318, it is stated: "The common-law doctrine according to the weight of authority is, as stated in the reported case, that birth of issue alone does not work a revocation of a will of the father, previously made." So it is said in Annotation 152 A. L. R. 724: "At common law a child for whom no provision was made, and who did not appear, by the terms of the will of his parent, to have been omitted intentionally, had no rights in the estate as against the devisees or legatees." The rule is recognized as the common-law rule in textbooks generally. 1 Page on Wills, Section 514, Rood on Wills, Section 381, I Schouler on Wills, etc. (6th Ed.) Sec. 643, 28 R. C. L. 192. In Brush vs. Wilkins, 4 Johns. Ch. (N.Y.) 506, Chancellor Kent stated as follows: "The general reasoning on this subject, in favor of the revocation, is, that the testator having contracted new relations, such as those of husband or father, he must have intended a revocation of his prior will, because he must have meant to discharge the moral duties attached to those relations. * * * But the answer to this is, that the disposition of property is and ought to be governed by settled rules, and that according to the language and authority of the general current of cases, there must be both marriage and a child, to work a revocation of a will. It is the policy of the English law, to give to every man of competent will and understanding, the absolute control (however imprudently or improvidently he may at times exercise it) over the disposition of his estate; and children are not considered as having a legal interest or property in the effects of the father. Our law has rejected, or has never adopted, the notion of the *inofficiosum testamentum* of the civil law. It would be dangerous, and might lead to loose speculations, to give greater effect than the settled doctrine of the English law has already done, to the occurrence of new domestic

duties. Every person is permitted to make his own will, at his discretion; and he may even disinherit his children, if he should be so inclined, whether they deserved, or not, such extreme chastisement. Every material addition to the property of a testator, or alteration in the circumstances of his family, varies his relations and duties, either in kind or degree, and might be made the ground of very plausible and pathetic claims upon the Court for the application of this doctrine of a presumed revocation. Courts would be running the hazard of substituting their will for that of the testator."

The applicability of the foregoing rule is strengthened by the related rule announced in a number of cases that in the absence of a statute, subsequent marriage of a man does not revoke a will. See for instance Hilton vs. Johnson, 194 Miss. 671, 12 So. 2d 524, In Re Walter's Estate, 60 Nev. 172, 104 P. 2d 968, Sternberg vs. Trust Co., 163 Fed. 2d 714, and see Naab vs. Smith, 55 Wyo. 181, 97 P. 2d 677, I Page on Wills, supra, Section 510.

There has been some dissent from the rule above mentioned. In McCullum vs. McKenzie, 26 Iowa 510, it appears that the testator left all his property to his wife and sister. A son was born thereafter, and was of the age of 14 when testator died. At that time, the sister, too, was dead. It was held that the will was revoked by reason of change of circumstances, the court in part relying upon Sneed vs. Ewing, 5 J. J. Marsh. (Ky.) 472, in which it appears that the claimant, child of the testator, was born two months after the death of testator. The case also partly relies upon the case of Johnston vs. Johnston, an English case, cited supra, and also mentioned hereafter. For the purposes of the case at bar it is not necessary for us to question the correctness of the holding in the Iowa and Kentucky cases. We might come to the same conclusion if a similar state of facts were before us, since it may be that we should

follow—as we have already done in part—the rule laid down in Baacke vs. Baacke, 50 Neb. 18, 69 N. W. 303, where the court, after recognizing the common law rule that the birth of issue alone does not revoke a will previously made, stated as follows: "While our statute recognizes revocations of wills by implication of law, it has not undertaken to designate or specify what subsequent changes in the condition and circumstances of the testator will produce such revocation; but it is for the court to determine from the facts of each particular case, under the rules and forms of law, whether the testator intended the will to stand, notwithstanding the changes in his condition and circumstances." For other cases laying down the same rule see 1 Page on Wills, supra, Section 508, Note 4; for cases contra and not extending the cases in which implied revocation is applicable, except those mentioned in a statute, see Note 2.

By reason of laying down a general rule in McCullum vs. McKenzie, supra, the Iowa court felt compelled to hold in Negus vs. Negus, 46 Iowa 487, that if a testator leaves all his property to his wife, and subsequently children are born, the will is revoked. For other Iowa cases see Annot. Cas. 1913D, page 1327. The same question came before the United States Court of Appeals of the District of Columbia (decided under the law of Maryland—see 147 Fed. 2d 880) in Allen vs. Heron, 81 App. Cas. (D.C.) 298, 157 Fed. 2d 707. The decision is brief. The court after referring to the common law rule that marriage and birth of issue revokes a will stated as follows: "It does not follow that revocation of the present will would probably reflect the testator's wishes. Husbands are likely to foresee that they may become fathers. Particularly when the child is young and the estate small, husbands who are fathers often choose to leave all their property to their wives. We think the district court was right in applying the usual common-law rule that a will in favor of a wife is not

revoked by the birth of a child." We are inclined to believe that the case expresses a fact well known. The burden of bringing up minor children devolves upon the mother after the death of her husband, and generally speaking this burden is well met. There seems to be little reason that in case the property of the testator is of moderate proportions, she should be burdened both by caring for her children as well as by being compelled to take out letters of guardianship and making constant reports to the court. In view of the foregoing case, and the reasons underlying it, and in view of the prevailing common-law rule, we hardly think that we should take it upon ourselves to lay down a general rule that the birth of issue alone after the execution of a will should in all cases annul such will.

In the case of Karr vs. Robinson, 167 Md. 375, 173 Atl. 584, decided in 1934, it appears that the testator was married twice, having daughters by his first wife. He married the second time in 1927. He made a will in 1932, leaving his property in trust for his then wife and his daughters and in case of death of the latter, to his nieces. Three years thereafter another daughter, Sarah Riley, was born, and thereafter another child was expected. A few months after the birth of Sarah Riley, the testator wrote to the draftsman of his will as follows: " 'Regarding my will, in view of my having another heir, it should be changed somewhat. The name of that lady is "Sarah Riley." I also wish to eliminate that part of my will in which I make my sister's children beneficiaries. Instead, I wish the trusteeship dissolved and the money turned over to each of my children at the age of thirty-five. I, however, wish to continue the trusteeship for my wife.' " Shortly thereafter, and before a new will was executed, the testator died. It was held that the will was revoked. See comment on the case in 1 Maryland L. R. 32-50, 35 Columbia L. R. 787-788. The case relied strongly on, and

quoted from the case of Johnston vs. Johnston, 1 Phillimore 447, 161 Engl. Rep. 1039, already cited, and which we shall proceed to consider in greater detail. The case mentions the rule of rebuttable presumptions and the rule of tacit conditions. Just what bearing the latter rule had upon the decision, if any, is somewhat difficult to say. As we said in connection with the Iowa case of McCullum vs. McKenzie, supra, it is not necessary for us to say that the facts in the case did not warrant the holding that the will was revoked.

In Johnston vs. Johnston, supra, the court held that the birth of issue alone after the execution of a will does not revoke it, but that the birth of issue plus a number of other facts and circumstances did. It is the most exhaustively discussed case on the subject before us. In that case it appears, among other matters, that the testator made his will in 1793. His property at that time amounted to about 20,000 pounds sterling. He bequeathed 10,000 pounds to the child which was then expected to be born and the remainder to his son. Thereafter four other children were born. The testator suddenly died of apoplexy on July 3rd, 1815. At that time his property amounted to 300,000 pounds sterling. In the meantime he had numerous conversations with his wife, in which he indicated that he intended to make another will, and that in the absence thereof the law would make one for him. Documents, too, and papers were found, drawn by the deceased, one as late as 1814, showing a sketch of a new will. The court fully recognizing that birth of issue alone does not revoke a will, concluded: "Unquestionably where a will has been once regularly made, the presumption of law is strong in its favor; and, as Sir George Hay states, 'The intention to revoke must be plain, and without doubt.' But, under all the facts of this case, taking the subsequent birth of issue as the essential basis of the proof, and accompanied as it is by the other concurrent circumstances,

I am of the opinion that the intention of the testator is "plain, and without doubt," and, therefore, that I am warranted in law and justice to pronounce against this will, upon the ground that it has been revoked." The court also stated among other things; "The birth of children, after making a will by a married man, may have imposed as strong a moral duty upon him, forming the ground work of presumed intention, and may be accompanied by circumstances furnishing as indisputable proof of real intention, as if the will had been made previous to the marriage. * * * if it is the legal duty of a father while living to maintain his children, so it is a strong moral obligation upon him not to exclude them from a provision after his death. It is true he has a right to do it; * * * at present he may if he pleases, and the law can afford no relief; but by moral obligation there is a strong foundation laid for presuming that he did not intend to exclude them." Again it was said: "The first principle of all wills is the intention of the testator. Positive law and the decisions of Courts have prescribed certain rules for ascertaining that intention. They have prescribed that a will of land shall not be good unless executed in the presence of three witnesses; that a will of personality shall not be good (with certain exceptions), unless it be in writing. So again, the law has established rules for ascertaining the intention of revoking; in some cases it requires certain acts to be done by the testator. It has also, from certain circumstances, implied an intention to revoke. The change of circumstances may imply a change of intention; but the great circumstance which has been regarded as laying the foundation of this implied change of intention is the subsequent acquirement of new moral duties. It is the duty of a father to provide for his children. The law upon that duty as the principal circumstance may safely found the intention to discharge it. The Roman law acted upon that circumstance alone, and presumed

an intention not to exclude the children. The law of England has not gone so far. It has adopted it as a leading circumstance, but not as alone sufficient to shew an intention to revoke."

Stress was laid on the fact that the testator died of apoplexy and the court stated in part: "If, notwithstanding the writing of this paper containing such a disposition, the deceased had had a long illness; had been aware of his approaching death, and yet had taken no steps, nor expressed any desire to make another will; such a circumstance might have carried some inference adverse to revocation; but he died suddenly of an apoplexy." The court also quotes from Swinburne, who wrote on the subject of revocation of will, and stated: " 'If a testator, after making a testament, should have a child born, I suppose the testament is not thereby presumed to be revoked, especially if the testator lived a long time after the birth of the child, and might have altered the testament, and did not.' "

We think that we should hardly be warranted in going beyond the general rule applied in the case last cited. We adopted our probate code from California by legislation of 1890-91. At that time California had a provision (Civil Code, Sec. 1306) reading as follows: "Whenever a testator has a child born after the making of his will, either in his lifetime or after his death, and dies leaving such child unprovided for by any settlement, and neither provided for nor in any way mentioned in his will, the child succeeds to the same portion of the testator's real and personal property that he would have succeeded to if the testator had died intestate." The legislature of this state must have been aware of that provision when it adopted our probate code. Yet it failed to embody the foregoing or similar provision, so that we hardly feel warranted in ignoring the common-law rule on a subject which our legislature

apparently deliberately left alone. Buller, Justice, in Brady vs. Cubitt, 1 Dougl. 31, 99 Engl. Rep. 24 ruled that: "Implied revocations must depend on the circumstances at the time of the testator's death." See also Lugg vs. Lugg, 2 Salkeld 592, 91 Engl. Rep. 497. So we must examine the facts in this case in that light, and bearing in mind that a competent testator generally has, in the absence of a statute, the right to dispose of his property at his pleasure. It does not appear in the record before us what was the amount and value of the testator's property at the time when he made his will or when the appellant was born, so that we do not know whether it had increased by the time of his death. He left property of the value of about $115,000. It is not alleged how much the daughters would receive. The widow of the testator was left a specific piece of real property in the will. From the allegations herein we infer that this was no longer owned by the testator at the time of his death. We cannot presume that she received, or was content to receive, nothing. Perhaps she exercised her right to take contrary to the will, leaving the daughters one-half, or approximately $19,000 each. At the time of the testator's death, appellant was nearly 42 years of age—a man of mature years. For aught that appears herein, he may have accumulated property of $19,000 or much more. The daughters were presumbaly not in like position to do so. It is alleged that the appellant was an after-born child, and that "it was the expressed intention of the said deceased for the plaintiff to have an equal share of his said estate with the other children." It does not appear whether such intention was expressed in the early or the late life of the testator, or whether it was verbal or in writing. Nor have counsel for appellant clarified this point in their argument in this court. In Johnston vs. Johnston, supra, parol declarations of intention to alter the will were admitted. In Wheeler vs. Wheeler, 1 R. I. 364, and

Hoitt vs. Hoitt, 63 N. H. 475, and other cases, it was held that they should not be admitted. Assuming, however, that they would be admissible, the foregoing allegation can hardly be considered of much force in view of the fact that the testator left his will in effect in this case for nearly 42 years after the birth of the appellant. "Mere intention or avowed purpose so to do (to make a change), wholly unaccompanied by some act constituting revocation or supersession, will not suffice to impair the will." Aten vs. Tobias, 114 Kan. 646, 220 P. 196, 201, and cases cited.

In Re Alburger's Estate, 274 Pa. 10, 117 Atl. 450, it appears that the testator had only one son. This son died in January, 1890. The testator made a will in March, 1890. Thereafter a granddaughter, daughter of the son, was born, being a posthumous child of the father. The testator, the grandfather made no provision for the granddaughter and it was contended that this revoked the will under the common law. The testator lived 9½ years after the birth of the granddaughter without changing his will. It was held that this fact rebutted any presumption of revocation. The court said in part: "Testator lived for 9½ years after the child was born; during this time, although he had every opportunity to do so, he did not change his will; he had cause to do it, reasoning from the moral obligations here urged. If it be conceded the implied presumption exists and applies as at common law, then we agree with the court below that, as such presumption is one of fact, it is rebuttable; the absence of change in the will for a period of 9½ years after appellant's birth would override the presumption. It is hardly possible testator, knowing he had an only descendant in the person of a grandchild, would permit the will to remain unless he intended to cut her out. The facts here supply all that would be necessary to continue the instrument as a valid will." This holding is in line with what was said, as

already noted, in Johnston vs. Johnston, supra, and by Swinburne. It is also in line with other cases, which deal with the question as to whether or not a divorce should be held such a change of circumstances as to cause a will to be revoked. It is said in Annotation 69 L. R. A. 942: "The fact that, after the granting of the divorce with the knowledge of the testator, he had ample time before his death to change his will in regard to the legatee affected by the divorce, is a circumstance which is justly regarded as of great weight in support of the conclusion that he desired the provisions carried out which were embodied in his will at the time of his death." Supporting this statement are Card vs. Alexander, 48 Conn. 492, 40 Am. Rep. 187 (5 years elapsed), Charlton vs. Miller, 27 Ohio St. 298, 22 Am. Rep. 307 (5 years elapsed), In Re Joines' Estate, 211 Pa. 364, 69 L. R. A. 940, 60 Atl. 915 (2 years elapsed), In Re Arnold's Estate, 60 Nev. 376, 110 P. 2d 204. In the last of these cases it is said: "A strong circumstance against the theory of implied revocation is that the will, from the time of the divorce to the death of the testator, remained in his possession a period of eleven months. This principle should therefore apply: 'Where a man retains a revocable instrument with full opportunity of revoking it, and does not revoke it, there is a strong presumption that he wishes it to stand.'" In the Connecticut case the court said: "Add to this the further fact * * * that he lived nearly five years after the divorce making no change in his will, and the conclusion is well nigh irresistible that he did not intend to deprive his former wife of the provision he had made for her. There is not therefore sufficient reason for presuming that the testator intended by procuring the divorce to revoke the legacy to her; and these considerations are cogent reasons why we should not hold, as matter of law, that the divorce revoked the legacy." It may be noted that in these cases, too, the intention of the testator was the

346

paramount consideration. The rule so announced cannot be ignored. The time that elapsed between the birth of plaintiff and the death of testator is more than 4 times the 9½ years mentioned in the Pennsylvania case of In Re Alburger's Estate. The testator, it is true, was legally compelled to support the appellant during the latter's minority. And the legal duty was a moral duty as well. So that we may, for the purpose of this case, and to reasonably meet the spirit of modern legislation, concede that if the testator had died during the minority of the appellant, a presumption would arise under the circumstances in this case, that the testator did not intend that the will which he made should remain in effect. When the legal duty ceased, the moral duty presumably ceased as well, unless, perhaps, in exceptional cases. And it is difficult to see that when testator left his will in force for nearly 21 years after the majority of the appellant, a presumption could nevertheless arise, or if it arises, persist under the facts before us that he intended to revoke it.

It is contended on behalf of the defendants that the action herein is barred by reason of the fact that the question herein was not raised within the time in which a will may be contested as provided in Section 6-414, Wyo. Comp. St. 1945. It is not necessary to determine that question herein. The authorities on the subject are not in accord. As holding that a pretermitted child need not or cannot raise the question of his right in a contest of a will, see 57 Am. Juris. 531, Sec. 781, 16 Am. Juris. 856, Sec. 85, In Re Phillippi's Estate, 71 Cal. App. 2d 127, 161 P. 2d 1006, In Re Osborn's Estate, 167 Kan. 656, 208 P. 2d 257, Fisher vs. Gear, 196 Okl. 18, 162 P. 2d 182. On the other hand cases holding that the question may be raised or should be raised in connection with the probate or a contest of a will, see Taylor vs. Martin's Estate, 117 Tex. 302, 3 S. W. 2d 408, In Re Holmberg's Estate, 400 Ill. 366, 81 N. E. 2d 188, In Re

Golding's Estate, 58 Nev. 274, 76 P. 2d 1099, In Re Larsen's Estate, 18 S. D. 335, 100 N. W. 738, May vs. Brown, 144 Tex. 350, 190 S. W. 2d 715, 165 A. L. R. 1180, In Re O'Connor's Estate, 191 Minn. 34, 253 N. W. 18, Becker vs. Kurth, 241 Wis. 426, 6 N. W. 2d 233, Wilcox vs. Rootes, 1 Wash. (Va.) 140, In Re Massey's Estate, 187 Ore. 40, 208 P. 2d 341, Pascucci vs. Alsop, 79 App. Cas. (D.C.) 354, 147 Fed. 2d 880. See also Harris vs. Schoonmaker, 50 Wyo. 119, 58 P. 2d 415.

The judgment of the trial court is affirmed.

RINER, C. J., and KIMBALL, J., concur.