IN THE MATTER OF THE ESTATE OF FRANCESCO SANTELLI, DECEASED.

ESTER SANTELLI, CONTESTANT-APPELLANT, AND GUAR-ANTEE BANK AND TRUST COMPANY, EXECUTOR OF THE ESTATE OF FRANCESCO SANTELLI, DECEASED, DEFENDANT-RESPONDENT.

Argued October 20, 1958—Decided December 1, 1958.

332

*Mr. Frank Pascarella* argued the cause for contestant-appellant (*Mr. Herbert Horn,* on the brief and of counsel).

*Mr. Allen B. Endicott, Jr.,* for Guarantee Bank and Trust Co., executor, etc. (*Messrs. Endicott, Dowling & Endicott,* attorneys).

*Mr. William Elmer Brown, Jr.,* argued the cause for Jennie Rosa (*Messrs. Brown and Frank,* attorneys).

*Mr. John A. Miller* for Turiddo Simoni, Vice Consul, etc.

The opinion of the court was delivered by

FRANCIS, J.   This appeal was certified on our motion in order to decide the question of whether the marriage of a man impliedly revokes his antenuptial will.   The issue has never before been raised in the courts of this State.

At common law, marriage of a woman *ipso facto* revoked her will.   Upon her assumption of the marital status, the wife's identity became so merged with that of

her husband, and his control over her property so pervasive, that she lost the right to make a will. Consequently, it was considered that because the same capacity is required to revoke a will as to execute one, if the law did not impose revocation as an incident of marriage, the effect would be to endow her will with the quality of irrevocability during coverture. Such immutability was not only contrary to the essential ambulatory nature of a will but inconsistent, as well, with the dominion the husband was entitled to exercise over her person and property. 3 *Holdsworth, History of English Law* 409, 411, 425, 427 (*2d ed.* 1909); 1 *Jarman on Wills* 148 (*3d Amer. ed.* 1855); 1 *Page on Wills* § 516 (*3d ed.* 1941); *Schouler on Wills* § 424 (*3d ed.* 1900); 57 *Am. Jur., Wills* § 526.

However, the same consequences did not fall upon the antenuptial will of a man. The act of marriage alone did not produce invalidity. *Shepherd v. Shepherd,* 101 *E. R.* 29 (1770), *note.* His will survived until the birth of a child, in which event, in the absence of provision for the child, it was impliedly revoked. *Christopher v. Christopher,* 2 *Dick.* 445, 21 *E. R.* 343 (1771); *Marston v. Roe,* 8 *Ad. & E.* 14, 112 *E. R.* 742 (1838); 6 *Cruise, Digest of the Laws of England* 101 (1806); 1 *Jarman, supra,* 148, 149; 1 *Page, supra,* §§ 510, 515; 57 *Am. Jur., supra,* § 572. The English courts declared that the combination of marriage and parenthood constituted such a total change in the circumstances of the husband that his previously announced testamentary intent would be deemed altered. After some equivocation on the subject of whether there should be a rebuttable or a conclusive presumption to this effect, the doctrine was rested on the ground that the law imposed on the will at the time of its execution the tacit condition that it would be revoked by implication upon the happening of these specified contingencies. *Marston v. Roe, supra.*

A number of reasons were advanced for this disparity in treatment, whereby marriage in itself revoked the will of a woman but did not affect that of a man: A wife could take care of herself by antenuptial agreement; the law

gave her dower, of which she could not be divested by a testamentary act of her husband; an afterborn child had no such ability to fend for himself and he had no fixed inalienable life interest in his father's land. And further, it was pointed out that in the event of intestacy, the wife did not qualify as an heir to her husband's realty. *Shepherd v. Shepherd, supra; Brush v. Wilkins,* 4 *Johns. Ch. Rep.* 506, 518 (*Ch. N. Y.* 1820); 6 *Cruise, supra,* 105; 1 *Jarman, supra,* 148; 1 *Page, supra,* § 510; 57 *Am. Jur., supra,* §§ 526, 572; 95 *C. J. S. Wills,* § 291(1).

The doctrine of implied revocation produced many problems to vex the courts. Its applicability where a child was born posthumously was challenged vigorously. The contention was that such a birth could not be said to have affected the testamentary intention of the husband because he might not have been aware of his wife's pregnancy or could not know if his wife would miscarry, or that the child would be born alive. One aspect of the question was set at rest in *Doe v. Lancashire,* 5 *T. R.* 49, 101 *E. R.* 28 (1792), where the birth of a posthumous child was adjudged to generate the revocation if the husband was aware of the wife's pregnancy. But as late as 1815, judicial support existed for the proposition that in the absence of such knowledge the will would not be disturbed. *Doe v. Barford,* 4 *M. & S.* 10, 105 *E. R.* 739 (1815). And whether the birth of a child alone after the making of a will would cause revocation was likewise a matter of doubt and uncertainty. *Brush v. Wilkins, supra,* 516–519. And see *Van Wickle v. Van Wickle,* 59 *N. J. Eq.* 317 (*Ch.* 1900), wherein Vice Chancellor Pitney declared that at common law the event did not affect the will. Moreover, there were other qualifications on and puzzlements about the rule in action which interfered with the certainty and stability of the law in a field where such qualities were urgently required. 1 *Jarman, supra,* 152–156; 4 *Kent's Commentaries* 522–525 (3*d. ed.* 1836).

Another facet of the subject should be mentioned for purposes of perspective. A provision was added to the English

Statute of Frauds, 29 *Car.* II, *c.* 3, § 6, that a devise could not be revoked except by some other will or codicil in writing, or other writing declaring the revocation, or by burning, cancelling, tearing or obliteration; otherwise it should remain in force, "any former law or usage to the contrary notwithstanding." 8 *Statutes at Large* 406 (1763). This language stimulated the view that the doctrine of implied revocation had been removed from the law. However, in *Christopher v. Christopher* and *Doe v. Lancashire, supra,* the contrary holding was announced. The declaration was made, although not without dissent, that the statute applied only to express revocations and that the instances of implied revocation under discussion remained a living part of the common law. 1 *Jarman, supra* 150, 151; 1 *Page, supra,* § 488. Finally, in 1837 Parliament rendered the entire issue academic by enacting a new statute of wills which provided, among other things, that "[e]very will made by a man or woman shall be revoked by his or her marriage" (with an exception not here material) and that "[n]o will shall be revoked by any presumption of an intention on the ground of an alteration in circumstances." 7 *Will.* IV & I *Vict. Cap.* 26, §§ 18, 19; 26 *Halsbury's Statutes of England* 1339, 1340 (*2d. ed.* 1951).

With this historical background, we come into New Jersey to observe the evolution of our law on the subject. Search has revealed no case in the reports prior to 1824 dealing with the effect of the marriage of a man or woman on an antenuptial will.

Although in Colonial times a statute existed which required wills relating to realty to be signed and published in the presence of three subscribing witnesses, *L.* 1713–14; *Patterson, Laws of New Jersey* 5; *Lacey v. Dobbs,* 63 *N. J. Eq.* 325 (*E. & A.* 1901), our first comprehensive legislation on the subject of wills and descent and distribution followed the Revolution and statehood.

In 1795 the first general act "concerning wills" was adopted. *Patterson, supra* 189. A comparison of *section 2* thereof, regulating the manner of revocation, with *section 6*

of the English Statute of Frauds of 1676 which covers the same subject, establishes beyond doubt that our act was patterned after the latter. One circumstance is particularly revelatory. As has been indicated, the English act, after prescribing the specific methods of revocation, ended with the words "any former law or usage to the contrary notwithstanding." It will be recalled that the quoted words had given rise to the controversy as to whether *section* 6 had been designed to eradicate the implied revocation doctrine, and that in 1771 in *Christopher v. Christopher, supra,* it was held otherwise, and the application of the section was limited to express revocations. Also, as set forth above, it may be noted here that in November 1792, less than three years prior to our act, *Doe v. Lancashire, supra,* was decided. It was a landmark case in the field, in which, among other things, the construction of the same section was questioned and again confirmed. An obviously rational inference is that our Legislature was aware of the common-law doctrine of implied revocation and intended to avoid the argument which had troubled the English bench and bar. The motive was accomplished by excinding from our statute the quoted language concerning former law or usage. Thus it is apparent that since the *Constitution of* 1776, *section* XXII, adopted the common law of England for New Jersey, the principles of implied revocation of wills of men and women resulting from marriage and the birth of children, as they then existed, became operative here.

Some further aspects of the formative stages of our body of statutory law should not escape attention. *Section* III of the 1795 act continued the incapacity of a married woman to make a will disposing of "lands, tenements or hereditaments." There was no need to act specifically with respect to her personalty. On marriage and during coverture, it either passed to the husband's ownership or became subject to his control. Although she could make a will bequeathing her personal estate with his consent, the consent was as ambulatory as the will and could be revoked at any time during her life and after her death before probate. 1 *Jar-*

*man, supra* 30–32; *Van Winkle v. Schoonmaker,* 15 *N. J. Eq.* 384 (*Prerog.* 1862). *Section* XII took cognizance of this rule of the common law and continued it, prescribing:

"That it shall and may be lawful to and for all and every person and persons, by his, her, or their testament or last will in writing, to give, bequeath or dispose of all his, her, or their goods, chattels, and personal estate, in the same manner as he, she, or they lawfully might do before the passing of this act."

In the same year, 1795, legislation was approved concerning the distribution of intestates' estates. *Patterson, supra,* 153. Under it the widow was given one-third of the personal estate and the remainder went to the children. If there were no children or representatives of them, the widow was to receive "one moiety" with the residue going to the next of kin. *Section* XIII. But when a married woman died intestate, her personal estate passed to the husband. *Section* XV. Then in 1799, *Patterson, supra,* 343, the widow's right of dower was established. A life interest in one-third of her husband's real estate was conferred irrespective of whether he died testate or intestate. *Section* I.

Obviously, all of this legislation was a reflection of the influence of the English statutory and common law, and represented the effort of the infant sovereignty to govern itself and its people.

No significant development, either judicial or legislative, in the area of our study occurred until 1824 when the Wills Act of 1795 was supplemented. *L.* 1824, *p.* 174. Before discussing the new matter, added attention may be given to a significant decision in New York which was issued in August 1820. In *Brush v. Wilkins, supra,* (which has been cited in practically every opinion in this country where the present problem has been given consideration), Chancellor Kent accepted the English common-law doctrine that marriage of a man followed by birth of a child impliedly revokes his antenuptial will. His elaborate opinion discussed the English authorities at length, the vagaries and

uncertainties of some facets of the law with respect to the effect of marriage and afterborn children in various factual settings, and the ruling that implied revocations were not within the statute of frauds. It is difficult to believe that in this formative period of the New Jersey law our Legislature was unaware of this opinion.

In any event, in 1824 the lawmakers incorporated into the statute of wills in more liberal form the substance of the pertinent common-law rule. *Section* 1 ordained that

"every last will and testament made when the testator had no issue living, wherein any issue he might have, is not provided for or mentioned, if, at the time of his death, he leave a child, children, or issue, or leave his wife ensient of a child or children which shall be born, such will shall be void, and such testator be deemed to die intestate."

The more liberal treatment of the problem is apparent. The nullification of the will was not made dependent upon its execution prior to marriage. Execution at any time when the testator had no issue living sufficed. This benefited widow as well as afterborn children. The posthumous child, who had been the subject of much debate in England, was provided for.

And *Section* 2 says:

"That if a testator having a child or children born, at the time of making and publishing his last will and testament, shall at his death, leave a child or children born after the making and publishing of his said last will and testament, or any descendant or descendants of such after born child or children; the child or children so after born or their descendant or descendants respectively, if neither provided for by settlement, nor disinherited by the said testator, shall succeed to the same portion of the father's estate, as such child or children, or descendants as aforesaid, would have been entitled to, if the father had died intestate * * *."

Moreover, this act also dealt with the troublesome problem of lapse of devises or bequests. See 1 *Jarman, supra,* 304 *et seq.* *Section* 3 declared that when an estate of any kind was devised or bequeathed to a child or other descendant of the testator or testatrix (note the consciousness that the

will of a married woman, whose husband consented to its making, might be involved), who shall die in the lifetime of the testator or testatrix, leaving a child or children or descendants of them who shall survive, the devise or bequest should not lapse but should vest in such child or children or descendants of them just as if the legatee or devisee had survived the testator and died intestate, unless the will directs otherwise. In this connection, it is interesting to note that a similar provision did not appear in England until the Wills Act of 1837, § 33. See *Appendix, 2 Jarman, supra* 543.

Study of the English common and statutory law in relation to our Wills Act of 1795 and the 1824 supplement renders it virtually an inescapable conclusion that the Legislature was acutely aware of the problems involved and intended to act with respect to them. This is particularly true of the doctrine of implied revocation of antenuptial wills. There can be no doubt that the lawmakers brought into our statutory law the basic common law and clarified and liberalized it (judged by then existing standards).

Subsequent history warrants comment. After Chancellor Kent's decision of 1820 in *Brush v. Wilkins, supra,* the New York Legislature also became conscious of the implied revocation problem. In 1827 that body passed a general wills and distribution act, which in most respects here pertinent was substantially similar to ours. 2 *Revised Statutes of New York* 1 *et seq.* (1836). However, *section* 43 thereof ordained that an antenuptial will of a man disposing of his whole estate would be voided by marriage and afterborn or posthumous issue if the wife *or* the issue shall be living at his death and if no provision was made for the issue by previous settlement or in the will and the issue were not clearly excluded by mention therein.

The minutes of the General Assembly of New Jersey of February 8, 1834 show that in 1833 a resolution had been adopted relating to a revision of the "Orphan's Court System." The *Journal* of that day contains the report of Joseph Warren Scott, Esq., who had been appointed in April 1833 to "revise,

amend and digest that part of our Statute Laws which refer to the Prerogative and Orphan's Courts and the matters therewith connected, and to make report to the Legislature."

Portions of the report bear quotation:

"Understanding the directions in the resolution and the commission consequent upon it, to embrace that entire portion of our jurisprudence which relates to descents, distribution, dower, testaments and intestacy, as well as the principles of practice in those Courts to which matters of this nature are properly committed, I hesitated, very much, to accept the appointment.

That it was to be an arduous and difficult undertaking and one of immense responsibility, was palpably plain to the most superficial observer.

For nearly half a century, the difficulties in the subject have been multiplying and expanding; while the vital interests of a great majority of the community in the questions to be decided, have at the same time been increasing in accumulated ratio.

The incongruous and inconsistent authorities in some of our tribunals, constituted after the general model of the Ecclesiastical Courts in England, tend evidently to embarrassment and perplexity.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

In common with many others of my fellow citizens, I had and have a strong desire to put a period to that frightful tale of horrible injustice for a long time committed, repealed and re-repealed in the semblance of equity and under the forms of law.

The wrongs of the widow and the orphan, have created an immense arrear of injustice.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Having laboriously and faithfully investigated the system of the Law of Testaments and Intestacy in the different States of the Union, I have not scrupled to borrow from their various codes.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

I have the honor to report for the inspection and revision of the Legislature, eleven bills, entitled respectively as follows:

1. An act concerning wills.

2. An act concerning Executors and Administrators.

3. An act for the just and equal distribution of the estates of intestates.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

8. A supplement to the act relative to Dower.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

10. A further supplement to the act directing the descent of real estates."

The minutes continue that the report was read and referred to a committee together with the bills "therein mentioned."

Nine months later, the *Journal* shows a communication from Mr. Scott indicating that the committee had studied the matter and (quite apparently some time previously) "had made their report approbatory of the system, and of the principles reported in the Bills." It appears also that the committee recommended, and the House approved, liberal circulation of the report during the recess of the Legislature and "that various public functionaries should be supplied with copies." The letter concluded by suggesting that "it would tend greatly to convenience and would abridge many disputes, to revise that entire subject; and to bring all the matters connected with it into one statute." The *Journal* of November 6, 1834, sets out the letter in full and then notes:

"Which communication was read—and Ordered to lie on the table."

Our search has failed to disclose the ultimate fate of the Scott study and proposed legislation. The full text of his report cannot now be found in the archives nor can the bills be unearthed. But that among other things they included *section* 1 of the 1824 act concerning revocation by afterborn issue, either as then phrased or somewhat revised, is reasonably plain. Chancellor Kent's *Commentaries,* which were published in 1836, make reference at *page* 526 to the New York statute of 1827 which, as has been said, caused revocation of the antenuptial will of a husband if an afterborn child *or* the wife survives him. In a footnote to this reference, the following appears:

"The *Revised Bills for New-Jersey,* as reported in 1834, adopted this provision essentially, but they omitted the provision for the case that *the wife,* and not the issue, was living at the testator's death."

There can be no doubt that the Chancellor had seen Mr. Scott's report and proposed legislation. On *page* 525 he discussed the changes that had been made by statute in some states, including New Jersey, with respect to post-

humous children born after the making of the will. The statement indicates that the change mentioned is one brought about by the 1824 act and that the Scott revision proposed no departure therefrom. The footnote says:

"This appears to be the perfectly sound doctrine and rule on the subject, and it is adopted in the Revised Bills, as prepared and reported by Mr. Scott, of New-Jersey, in 1834."

Further references to the Scott bills on other phases of the law of wills and descent and distribution may be found in footnotes on *pages* 533, 537 and 542.

Our rather extensive allusion to Mr. Scott, his efforts at legislative revision, and the contemporary judicial and legislative attitude in New York and elsewhere[1] on the problem now before us is designed to demonstrate that the action of the New Jersey lawgivers in 1824 was intended to make implied revocation of an antenuptial will of a man depend not upon subsequent marriage but upon afterborn issue, and that in 1834 they decided not to alter or modify that policy.

Additional significance is justifiably attached to the 1824 act. We have pointed out that *section* 2 of the Wills Act of 1795 did not embrace the words of the English Statute of Frauds which caused the controversy as to whether the aim of Parliament was to wipe out the implied revocation doctrine. This omission warrants the conclusion that the motive was to retain the common-law rule. But in 1824 the common law, as modified by the de-emphasis of the marriage element of the doctrine, became statutory. Accordingly, added vigor was given to the revocatory section of the Wills Act (now *N. J. S.* 3A:3–3) as the exclusive legal mandate in the field, ruling out revocation of written wills except by the methods prescribed. *Cf. In re D'Agostino, 9 N. J. Super.*

---

[1] In April 1833, the very month Scott received his assignment from the Governor, the English Real Property Commissioners recommended alterations in the law concerning the revocation of wills. They suggested four modes, one of them being by marriage but only in the case of a woman. 4 *Kent, supra,* 533.

230, 232 (*App. Div.* 1950); *In re Comassi's Estate,* 107 *Cal.* 1, 40 *P.* 15, 28 *L. R. A.* 414 (*Sup. Ct.* 1895); *Gartin v. Gartin,* 371 *Ill.* 418, 21 *N. E.* 2d 289 (*Sup. Ct.* 1939); *Hertrais v. Moore,* 325 *Mass.* 57, 88 *N. E.* 2d 909 (*Sup. Jud. Ct.* 1949); *In re Walters' Estate,* 60 *Nev.* 172, 104 *P.* 2d 968 (*Sup. Ct.* 1940); *In re Cabaniss' Estate,* 191 *Okl.* 340, 129 *P.* 2d 1003 (*Sup. Ct.* 1942); *Owen v. Younger,* 242 *S. W.* 2d 895 (*Tex. Civ. App.* 1951).

Moreover, the 1824 act went through the 1877 *Revision, p.* 1246, the 1910 *Compilation,* 4 *C. S. p.* 5865, and the first (1934) and second (1936) drafts of the *Revised Statutes* unchanged. In the *Revision* as adopted in 1937,. the two sections concerning revocation because of afterborn children are also unaltered in substance, although the language was rendered more concise. *R. S.* 3:2–15, 16. In 1950, the Legislature selected an advisory committee to revise *Title* 3 of the *Revised Statutes* relating to the administration of estates. The chairman of the committee (known as The Advisory Committee on the Revision of Statutes) was former Superior Court Judge Clapp, whose well-known work on *Wills and Administration* states:

"The statutes [*i. e., N. J. S.* 3A.:3–3] do not authorize the revocation of a will in any other way; hence neither a divorce of the testator or testatrix, nor his or her marriage, nor insanity, nor any other act, will operate to revoke a will after it is made." 5 *New Jersey Practice* (*Clapp, Wills and Administrations*) 124 (1950). (Insertion ours)

The revision produced by this Committee was accepted by the legislature in 1951 and became *Title* 3*A-Administration of Estates-Decedents and Others. L.* 1951, *c.* 345. The foreword to the new volume was written by Judge Clapp and indicates that a thorough examination of the whole subject was made. *N. J. S. A.* 3*A, p.* IX *et seq.* However, *R. S.* 3:2–15 and 16 were brought unaltered into the new title as *N. J. S.* 3*A*:3–10 and 11.

Thus the statutory law under which the revocation of a man's will was rested not on subsequent marriage but on

afterborn issue has passed unchanged through the various revisions and other legislative activities for 134 years. And the absence of any case in the books wherein the present contention was raised furnishes a rather clear indication that the bench and bar have regarded mere marriage of a man as insufficient ground for vitiating his will.

In the intervening 134 years, the widow's dower right, which cannot be cut off by will, has been increased to a life interest of one-half of the husband's real estate. *N. J. S. 3A* :35–1. In case of intestacy her interest in personalty has remained one-third where there are children or such persons as legally represent any child who may have died, *N. J. S. 3A* :4–2, but if there are no children or legal representatives of them, she now takes all of the personalty and realty. *N. J. S. 3A* :4–3. Also, by the Married Women's Act, she has been given capacity to own, hold and use her own property as if single, *R. S.* 37:2–12, and since 1864 she has been empowered to make a will "as if she were at the time of the making * * * a feme sole and unmarried." *L.* 1864, *c.* 396; *R. S.* 37:2–2. As a result, the Court of Chancery held that marriage does not revoke her antenuptial will. *Webb v. Jones,* 36 *N. J. Eq.* 163 (*Ch.* 1882). This gives rise to the interesting question of whether the birth of a child in such a case would effect revocation. The Michigan Supreme Court said that with the advent of legislative authority to execute a will which would survive an assumption of marital status, the common-law doctrine formerly applied to the husband alone would control and her testament would be abrogated on birth of a child. *Durfee v. Risch,* 142 *Mich.* 504, 105 *N. W.* 1114, 5 *L. R. A., N. S.,* 1084 (1905). In New Jersey, since the statutory right to have a will was granted to women long after the act invalidating the will of a "testator" made before the birth of a child, a sensible solution would seem to be to construe the words "testator" and "he" in *N. J. S. 3A* :3–10 as relating to females as well as males. Such is the clear tenor of *Walker v. Hyland,* 70 *N. J. L.* 69 (*Sup. Ct.* 1903); *N. J. S. A.* 1:1–2, and there appears to be no substantial reason for reaching a

different conclusion in this connection. The incongruity of a contrary result is obvious.

Many states have legislated with respect to the effect of marriage alone upon an antenuptial will; many others have given a widow an absolute election to take a fixed share of the husband's estate as against his will. And some courts have declared that because a statute has given the wife a right of inheritance of realty in the event of his death intestate, the subsequent marriage impliedly revokes the will. *Tyler v. Tyler,* 19 *Ill.* 151 (*Sup. Ct.* 1857); *In re Teopfer's Estate,* 12 *N. M.* 372, 78 *P.* 53, 67 *L. R. A.* 315 (*Sup. Ct.* 1904); others have held to the contrary. *Goodsell's Appeal,* 55 *Conn.* 171, 10 *A.* 557 (*Sup. Ct. Err.* 1887); *Bowers v. Bowers,* 53 *Ind.* 430 (1876); *Hoy v. Hoy,* 93 *Miss.* 732, 48 *So.* 903, 25 *L. R. A., N. S.,* 182 (*Sup. Ct.* 1909); *In re Wehr's Will,* 247 *Wis.* 98, 18 *N. W. 2d* 709 (*Sup. Ct.* 1945). Most of the cases turn on the language of the local statute which either revokes the antenuptial will upon marriage or confers on the wife some interest in her husband's estate of which she cannot be deprived. *Brown v. Scherrer,* 5 *Colo. App.* 255, 38 *P.* 427 (1894), affirmed *per curiam sub nom. Scherrer v. Brown,* 21 *Colo.* 481, 42 *P.* 668 (*Sup. Ct.* 1895); *Herzog v. Trust Co. of Easton,* 67 *Fla.* 54, 64 *So.* 426 (*Sup. Ct.* 1914); *Vanek v. Vanek,* 104 *Kan.* 624, 180 *P.* 240 (*Sup. Ct.* 1919); *In re Hall's Estate,* 106 *Minn.* 502, 119 *N. W.* 219, 20 *L. R. A., N. S.,* 1073 (*Sup. Ct.* 1909); *In re Hulett's Estate,* 66 *Minn.* 327, 69 *N. W.* 31, 34, 35, 34 *L. R. A.* 384 (*Sup. Ct.* 1896); *Hoy v. Hoy, supra; In re Adler's Estate,* 52 *Wash.* 539, 100 *P.* 1019 (*Sup. Ct.* 1909), *modified Id.,* 100 *P.* 1135; *Burns v. Burns,* 67 *Wyo.* 314, 224 *P. 2d* 178 (*Sup. Ct.* 1950); and see generally, 1 *Page, supra,* § 512; 57 *Am. Jur., supra,* §§ 527, 528; 95 *C. J. S., supra,* § 291(1).

■■ The right to inherit property or to receive it under testamentary disposition is the creation of legislative enactments. *In re Holibaugh,* 18 *N. J.* 229, 234 (1955). New Jersey has established a statutory framework for the execution and revocation of wills, for the descent and distribution

of estates and for the dower of· the wife. With obvious knowledge of the state of the common law as to the effect of marriage and the birth of issue on the antenuptial wills of both husband and wife, the Legislature ordained in effect by what is now *N. J. S.* 3*A*:3–10 that regardless of when the marriage occurred a will made when the testator had no issue living would be revoked by unmentioned or unprovided-for afterborn issue. All of these statutes represent the policy of the State as to the interest to be granted to the wife in her husband's estate and the effect of the marital and family status on antenuptial wills. And clearly the policy was to limit the common-law doctrine of revocation to an afterborn child or children regardless of when the will was executed in relation to the marriage.

A forceful and persuasive argument is made against the legislative policy. It is an odd state of the law which requires a husband to support his wife during her lifetime under pain of criminal sanctions and yet permits him through the agency of his last will to leave her destitute on his death, except for a possible and, in any event, usually insubstantial dower interest, if he happened to own any real estate at that time. Many jurisdictions have adopted forced heir or widow election statutes to assure the widow of a share of his assets. For example, in our neighboring states of New York and Pennsylvania, an antenuptial will of a husband or wife, which does not provide for the survivor (in the former) or for the survivor or afterborn, posthumous or adopted children, results in intestacy as to the survivor or survivors. § 35 Decedent Estate Law, 13 *McKinney's Consolidated Laws of New York Annotated, p.* 345; § 21 Wills Act of 1917, 20 *P. S.* § 273. And in both states the widow has the right of election to take under the will or the share she would be entitled to in case of intestacy (subject in New York to some qualifications not of moment here). § 18 Decedent Estate Law, *supra, p.* 108 and *Pocket Part;* § 23(a) Wills Act of 1917, 20 *P. S. c.* 2, *Appendix,* § 261; § 8 Wills Act of 1947, 20 *P. S.* § 180.8. See also the English Family Protection Act, 34 *Halsbury's Laws of*

*England* 439 (*2d ed.* 1940); §§ 32 and 41 of the *Model Probate Code*.

The wisdom or policy of a statutory scheme is not for the courts; it is for the Legislature. Our task is to interpret and construe. Pursuit of that function in this instance requires us to reject the plaintiff's contention.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For reversal*—None.