721 A.2d 1019 (1999)
Norman CZOCH, Executor of the Estate of Josephine Czoch, Deceased, Plaintiff/Respondent/Cross-Appellant,
v.
Joan FREEMAN and Joanne Freeman, Defendants/Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 1998.
Decided January 5, 1999.
*1020 Samuel C. Inglese, Metuchen, for defendants/appellants/cross-respondents (Moss and Inglese, attorneys; Mr. Inglese, of counsel and on the brief).
Oliver Kovacs, Perth Amboy, for plaintiff/respondent/cross-appellant.
Before Judges WALLACE, NEWMAN and FALL.
The opinion of the court was delivered by WALLACE, J.A.D.
This appeal concerns competing claims to the estate of decedent Josephine Czoch (Josephine) and related life insurance proceeds and pension benefits. Norman Czoch, executor of Josephine's estate, filed a complaint against his sister and niece alleging that all monies and assets given to them by Josephine were assets of the estate. Defendants, Joan Freeman and her daughter Joanne, disputed plaintiff's assertion and claimed the assets had been gifted to them. In the bifurcated liability trial, the trial judge held in favor of plaintiff finding insufficient evidence to establish the various assets had been gifted to defendants. In the damages trial, a different trial judge awarded damages to plaintiff in the amount of $161,186.67, which included insurance proceeds and pension *1021 benefits previously paid to Joanne as beneficiary.
Defendants appeal, contending the trial judge in the liability trial erred in failing to find the monies given to defendants were gifts and the trial judge in the damages trial erred in finding the insurance proceeds and pension benefits should be included in Josephine's estate and in determining the amount of the damage award. Plaintiff cross-appeals, challenging the trial judge's failure to include prejudgment interest and the failure to include all of Josephine's Social Security payments in the calculation of total revenues. We reverse the inclusion of the insurance proceeds and pension benefits in the estate and remand for additional findings concerning the amount of Social Security benefits to be included in the estate and recalculation of the total revenue. In all other respects, we affirm.

THE LIABILITY TRIAL
Josephine died testate on February 8, 1993. In her will dated March 31, 1992, she bequeathed her estate equally to her children Anthony Czoch, John Czoch, Norman Czoch, and Joan Freeman. She named Norman as executor. The sons discovered their mother's estate was very small. They believed that Joan held money that belonged to Josephine's estate. On March 20, 1995, Norman, as executor of Josephine's estate filed a complaint against his sister Joan and his niece Joanne. The complaint alleged that money given by Josephine over the years to Joan and Joanne was not intended to be gifts, but rather Joan held the funds in trust for her mother. Joan and Joanne answered, claiming that the monies given to them by Josephine were gifts.
Norman recalled that in 1986, Anthony and he asked Josephine for a $60,000 loan to purchase several cottages in South Seaside Park. Josephine replied that she would consider it. Later she agreed to lend the money, stating that Joan had the money and would have a check ready. Norman then arranged with Joan to obtain the money. As part of this transaction, Norman and his partners executed a note and mortgage to Joan and her husband. Norman stated that when he paid the loan back to Josephine, she inquired why Joan's husband's name was on the note because it was Josephine's money.
Norman stated that he made similar arrangements for a $25,000 loan from his mother, although a note and mortgage was not executed. He received a $25,000 check signed by Joan. Norman stated that Josephine had her own checking account and paid her bills from this account. He began preparing Josephine's income tax returns about eight years before her death. He never included any interest income on the tax returns because there was none.
Anthony lived with his mother up until her death in 1993. He substantiated Norman's account of the $60,000 loan from Josephine in 1986. He recalled that his mother told him to see Joan for the money because "she has my money." Later, Josephine told him to go to attorney John Stockel's office to get the money. Anthony stated that Stockel was handling the papers for the purchase of the property so the check for the loan automatically went to Stockel. Anthony signed the note and mortgage which listed Joan Freeman and Charles Freeman, her husband, as the mortgagors. When he returned home and showed his mother a copy of the documents, she said "this is my money, this is not Joan Freeman or Charles Freeman's money; their name should not be on this loan, it's my money." Anthony explained that on another occasion Joan agreed to loan them $25,000 for remodeling the cottage. He said that nothing was ever said about repaying the money.
John testified that he also had occasion to borrow money from his mother. In 1970 he borrowed $2,200 to buy a new car and in 1977 he borrowed $1,200 for insurance. Later, John borrowed $6,500 from Josephine to buy a piece of property, and in 1990 he borrowed an additional $25,000 for business purposes. When he borrowed the $25,000, Josephine told him to go to Joan for the money. He then called Joan and in a couple of days she gave him the money.
John explained that he also discussed the insurance policy and pension benefits with his mother. He stated that Josephine asked *1022 him what she should do with it and he replied leave it in Joan's name, she "will do the right thing." On other occasions, John suggested that Josephine leave all of her money to her grandchildren.
Attorney John Stockel, who had represented the family for a number of years, drafted Josephine's will. He testified that he did not recall asking her about her assets, but that her will left everything equally to her four children. He had no knowledge about the insurance policy and pension benefits until after Josephine's death.
Defendant Joan Freeman is Josephine's only daughter. Joan testified that beginning in 1973, Josephine, who was employed at a retirement facility, gave her payroll checks to Joan and instructed her to cash the check and bring back the money, or deposit the money in Josephine's account, or to keep the money for herself. Joan opened a joint account with Josephine. When her mother found out about the joint account, Josephine instructed her to remove Josephine's name from the account and to place the money in Joan's children's name.
Joanne Freeman is Joan's daughter and Josephine's granddaughter. Joanne testified that between 1980 and 1983, when she was between the ages of fourteen and sixteen, her grandmother would give her a check with instructions to cash it, place it in her checking account, or to keep it. If the check was given to her for her own use, Joanne would spend it on herself. She stated that once her grandmother gave her the checks, her grandmother never inquired about the checks or the money again.
The trial judge found that defendants failed to prove that Josephine made gifts of her income to them over the years. The judge reasoned that the amount of money allegedly given as gifts was substantial and the giving of such a large amount of money solely to her daughter Joan was inconsistent with the general intent of Josephine to distribute her estate evenly among her children. Further, he found no evidence that Josephine was unusually close to Joan or dependent upon her or that Josephine was upset with her sons. The judge found that Josephine continued to control the money held by Joan, as evidenced by Josephine's instructions to her sons to see Joan about the loans they sought, while stating that Joan "is holding my money." The judge was also impressed by Joan's testimony that she had opened a joint account for the funds and later changed it to eliminate Josephine's name at Josephine's request. The judge found this demonstrated Joan knew the money remained her mother's and that she was managing it. Consequently, the judge concluded that defendants failed to meet their burden of proof by clear and convincing evidence that the monies given by Josephine to them over the years were intended to be gifts.

THE DAMAGES TRIAL
The damages trial focused on the amount of money defendants held for the estate. The parties did not dispute the amount of Josephine's gross income, her tax deductions, real estate taxes, and homeowners insurance expenses. The major dispute concerned Josephine's lifestyle and how much money she spent in order to calculate the net amount available for her to give to defendants. The other major area of dispute concerned whether the proceeds from life insurance and Josephine's vested pension should be included in the estate. Joan was the designated beneficiary of these funds.
We need not recite most of the detailed testimony related to the damages trial. The parties stipulated that Josephine earned a base wage of $287,662.07 between 1973 and 1993; the Social Security payments received by Josephine totaled $23,928, but not including the years 1989 and 1990, and the total real estate taxes paid on Josephine's property was $34,508.17. The parties also stipulated that the amount paid to Joan for Josephine's life insurance policies and pension benefits was $104,772.61.
Both sides offered expert testimony from an accountant. Plaintiff's expert, Edward Suozzo, presented a spreadsheet detailing all of Josephine's income and projected expenses between 1973 and 1993. As part of that submission, he listed $30,971 for Social Security benefits received by Josephine between 1989 and 1993. At first, he estimated *1023 that Josephine spent approximately $100 a month for living expenses, but later increased that amount to $300 a month. Suozzo found a total of $325,601.32 in net funds. He then applied a five-percent interest factor to the net funds, based on an average of investment return rates and tax rate trends during the 1970s and 1980s. His calculations yielded $140,602.06 in interest. He estimated that the total funds available to decedent's estate from her earnings, after expenses between 1973 and 1993, was $466,302.36.
Defendants' expert, James Geib, also evaluated Joanne's financial information. He reviewed Josephine's lifestyle with Joan in reaching his conclusions. Based on a sampling of tax returns, Geib used the amount Josephine paid in sales tax between 1973 and 1993 to compute her sales tax expenditures. Based on these calculations, which included an estimate of non-sale tax expenditures, Geib estimated that 26.16 percent of Josephine's income between 1973 and 1993 was unused at decedent's death. Thus, according to Geib, Josephine would have had a net amount of $84,218.00 available after all of her expenses were deducted. This amount did not include Social Security or the life insurance proceeds and pension benefits. However, Geib claimed that it was necessary to deduct $51,500 from the $84,218.00 available, because that was the amount Josephine gave her sons which had not been paid back.
The trial judge determined that over the twenty-year period Josephine earned $287,662.77 in base pay and $34,272.60 in overtime pay; received $23,928.00 in Social Security benefits; received $14,136.29 in tax refunds, and was entitled to $104,772.61 in pension and life insurance proceeds. Thus, he calculated Josephine's net revenues to be $383,053.47 after deducting $81,717.80 in payroll withholdings.[1]
Regarding expenses, the judge included insurance premiums, charitable contributions, funeral expenses, real estate taxes, and other expenses to arrive at total expenses of $157,473. He then subtracted this amount from the total revenues of $383,053.47 to arrive at a net of $225,580.47. The judge rejected both parties expert's view regarding Josephine's personal expenses. Based upon the testimony that Josephine was frugal, he estimated that she would have spent one-third of her disposable income over the years. To reach the disposable income, the judge added $16,251, representing part of Josephine's disposable income reflected in her checking account records, to the net income of $225,580, for a total disposable income of $241,780.47. The judge then subtracted one-third of that amount, which he computed to $80,593, and subtracted that from $241,780 to reach a net figure of $161,186.67[2] as the amount of damages defendants owed to the estate. In addition, the judge found that plaintiff failed to prove an adequate interest rate that should be applied and therefore rejected plaintiff's claim for prejudgment interest. This appeal and cross-appeal followed.

I
Plaintiff contends the trial judge erred in not finding that Josephine made gifts of her income to them.
Initially we note our scope of review is limited to a determination of whether the trial judge's findings could reasonably have been reached on sufficient credible evidence in the record. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). "That the case may be a close one or that the trial court decided all evidence or inference conflicts in favor of one side has no special effect." State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). We must give deference to the opportunity of the trial judge to listen to the witnesses and evaluate their credibility. Id. at 161, 199 A.2d 809.
*1024 The burden of proving an inter vivos gift is on the party who asserts the claim. See Sadofski v. Williams, 60 N.J. 385, 395 n. 3, 290 A.2d 143 (1972) (quoting 5 New Jersey Practice) (Clapp, Wills and Administration, 3d ed.1962 § 15, p. 62; citing N.J.S.A. 2A:81-2); In re Dodge, 50 N.J. 192, 228, 234 A.2d 65 (1967) ("[T]he donee must show by explicit and convincing evidence that the donor intended to make a present gift and unmistakably intended to relinquish permanently the ownership of the subject gift. Only that understanding and absolute abnegation of power will make the alleged gift enforceable. If the judicial mind is left in doubt or uncertainty as to exactly what the status of the transaction was, the donee must be deemed to have failed in the discharge of his burden and the claim of gift must be rejected") (citations omitted). Moreover, a party who seeks to assert a claim or affirmative defense based on the oral testimony of a promise, statement or act of a decedent must prove such testimony by "clear and convincing proof." N.J.S.A. 2A:81-2. Thus, defendants had the burden of proof to demonstrate that Josephine made gifts to them.
The required elements needed to prove an inter vivos gift are that (1) the donor intended to make a gift; (2) the subject matter of the gift was delivered; and (3) the donor relinquished ownership and dominion over the gift. See Farris v. Farris Engineering Corp., 7 N.J. 487, 500-01, 81 A.2d 731 (1951) (citations omitted); Jennings v. Cutler, 288 N.J.Super. 553, 565, 672 A.2d 1215 (App.Div.1996). Moreover, the proof of these elements must be "clear, cogent, and persuasive." Farris, supra, 7 N.J. at 501, 81 A.2d 731.
Here, defendants failed to present "explicit and convincing evidence" that Josephine intended to make gifts of her assets in the form of pay checks, Social Security checks, and tax refund checks between 1973 and 1993. Defendants both acknowledged the receipt of Josephine's checks between 1973 and 1993. Josephine's sons, however, presented evidence that decedent maintained control of the funds and directed Joan to lend various sums to them. Defendants only offered their unsupported testimony in an attempt to prove that Josephine intended the monies as gifts. Consequently, there was substantial credible evidence in the record supporting the judge's findings that defendants failed to prove by clear, cogent and persuasive testimony that Josephine intended to give her income to them as gifts.

II
Defendants next contend that it was error to include the insurance proceeds and pension benefits paid to Joan as designated beneficiary as part of the assets that she was required to pay over to the estate.
In general, a designated beneficiary has a vested property right "which can be divested only by a change of beneficiary in the mode and manner prescribed by the [policy]." Metropolitan Life Ins. Co. v. Woolf, 138 N.J.Eq. 450, 454-55, 47 A.2d 340 (E & A 1946). Unless the change of beneficiary is executed in the manner prescribed by the policy, evidence that the insured intended to change the beneficiary will not effect the change. New York Life Ins. Co. v. Estate of Hunt, 150 N.J.Super. 271, 275, 375 A.2d 672 (App.Div.), certif. denied, 75 N.J. 28, 379 A.2d 259 (1977). However, this general rule may be modified where there is "substantial compliance" with the method prescribed in the policy to change the beneficiary. See Haynes v. Metropolitan Life Ins. Co., 166 N.J.Super. 308, 313, 399 A.2d 1010 (App.Div. 1979). Thus, only under limited circumstances will a designated beneficiary be denied the right to receive the insurance proceeds.
In Vasconi v. Guardian Life Ins. Co., 124 N.J. 338, 590 A.2d 1161 (1991), our Supreme Court addressed competing claims to an insurance policy in the context of a matrimonial property settlement agreement. The Court was faced with determining whether a property settlement agreement between decedent and his former spouse included proceeds from decedent's insurance policy which named his former spouse as beneficiary. The agreement executed in May 1985 provided that each waived all claims each had to the other's assets arising out of the marital relationship. Decedent died the following *1025 year without having changed his former spouse as the designated beneficiary under his insurance policy. The administrator of decedent's estate sought to include the insurance proceeds as part of the estate and filed suit against the former spouse. The Law Division judge granted judgment in favor of the former spouse and we affirmed. The Supreme Court held that in the context of a divorce agreement providing a mutual release of any claim concerning "all of the items of property, real, personal, and mixed, of any kind," of the other spouse, that the better rule is that "such a comprehensive agreement is presumably intended to settle all issues, including beneficiary designations, over each other's property." Id. at 346, 590 A.2d 1161. The Court remanded the matter for further proofs by the parties as to whether decedent intended to leave any life insurance proceeds to decedent's former spouse. In addition, the Court questioned, but did not decide, whether there should be a distinction between non-probate and probate assets and commented that wills and life insurance policies are functionally similar and should be treated the same in regards to whether the decedent's intentions are relevant. Id. at 342-46, 590 A.2d 1161.
In DeCeglia v. Estate of Colletti, 265 N.J.Super. 128, 140-41, 625 A.2d 590 (App. Div.1993), we held that oral statements of the individual insurance agent and attorney that the insured was contemplating changing the beneficiary designation under his insurance policy from relatives to the mother of his child did not accomplish a beneficiary change. Id. at 141, 625 A.2d 590. We concluded that such a verbal expression of decedent's intention to change the beneficiary on the insurance policy to his girlfriend was not strong enough to constitute substantial compliance with the policy's requirements for changing beneficiaries. Id. at 135, 625 A.2d 590. However, we also noted that public policy weighed heavily in favor of satisfying the policyholder's obligation to pay child support, such that a dependent child can sue the estate for support instead of becoming a ward of the State. Id. at 139-41, 625 A.2d 590.
In Prudential Ins. Co. v. Prashker, 201 N.J.Super. 553, 557, 493 A.2d 616 (App.Div.), certif. denied, 101 N.J. 334, 501 A.2d 983 (1985), we held that a son was entitled to the benefits of an insurance policy even though he was not the named beneficiary. We concluded that the facts were sui generis in that the insurer was aware of the conflicting claims; the intended beneficiary based his claim to the proceeds on grounds other than a gratuitous designation; a divorce judgment had instructed that the son be designated as beneficiary; and there was a strong need to encourage proof of compliance with a judgment of divorce. Id. at 556-57, 493 A.2d 616.
Recently in Seavey v. Long, 303 N.J.Super. 153, 156, 696 A.2d 102 (App.Div.1997), we reviewed a trial judge's imposition of a constructive trust on seventy-percent of the widow's benefit defendant, second wife, received from the Police and Fireman's Retirement Systems as a result of decedent's death. Plaintiff, first wife, had entered into a property settlement agreement with her then husband which provided:
"In the event that the Husband shall predecease the Wife, the Wife shall still be entitled to receive the spousal benefit portion of the Plan until her death. She shall further be entitled to receive any death benefits available through this Plan and the Husband shall make appropriate arrangements with his Pension Plan to effectuate that distribution."
[Seavey, supra, 303 N.J.Super. at 155, 696 A.2d 102 (quoting property settlement).]
The actual death benefits which had been made payable to defendant, second wife, were voluntarily paid over to plaintiff by defendant and were not an issue in the case. Id. at 156, 696 A.2d 102. However, there was a dispute over a separate widow's pension defined under N.J.S.A. 43:16A-12.1. This statutory benefit became vested two years after decedent married defendant. We concluded that the term "death benefit" in the property settlement agreement could not have referred to the widow's benefits created by statute for the benefit of defendant, the new wife. Id. at 157, 696 A.2d 102. Consequently, we held it was error to impose a *1026 constructive trust for the benefit of the first wife. Id. at 158, 696 A.2d 102.
In analyzing these cases, we note that in each case which allowed the insurance proceeds to be distributed to a person other than the named beneficiary, there was a writing to dispute the beneficiary designation. That is, there was either a written divorce agreement or a divorce judgment which was found to control the disposition of the insurance proceeds. In the cases rejecting a claim to divest a named beneficiary, there was no written agreement or expression of intent to find substantial compliance with the policy's requirement for changing the designated beneficiary.
In this case, there was no written expression of any intent to change the named beneficiary or for the beneficiary to hold the insurance proceeds for the benefit of her brothers. At the time Josephine designated Joan as her beneficiary, she also designated her son John as the alternate beneficiary if Joan did not survive her. Josephine could have named all of her children as beneficiary of her life insurance and pension benefits, but she did not. The record is silent why Josephine designated Joan as the sole beneficiary.
Moreover, in DeCeglia, supra, we expressly noted that the Court's comments in Vasconi which suggested that principles derived from the law of wills should be applied in determining the validity of an insurance beneficiary designation, was not at odds with our conclusion that a mere verbal expression of intent to change a beneficiary designation is ineffective. We explained:
Although testamentary intent is a necessary condition for admission of an instrument to probate, In re Will of Smith, 108 N.J. 257, 262, 528 A.2d 918 (1987), it is not sufficient. The decedent also must have executed either a formal will in conformity with N.J.S.A. 3B:3-2 or a holographic will in conformity with N.J.S.A. 3B:3-3. In re Estate of Peters, 107 N.J. 263, 526 A.2d 1005 (1987). A mere verbal expression of testamentary intent not formalized by any writing of the decedent is ineffective. See 2 Page on Wills § 19.5 (Bowe, Parker rev. 1960) ("Statutes in every state now require both wills and testaments ... to be in writing."); 5 New Jersey Practice, Wills and Administration § 49, at 188 (Alfred C. Clapp) (rev.3d ed. 1982) ("A will must be in writing."); cf. In re Will of Smith, supra, 108 N.J. at 265, 528 A.2d 918 ("[T]he doctrine of probable intent is available only to interpret, but not to validate, a will."). Likewise, a will may be revoked solely in the manner prescribed by the Wills Act, N.J.S.A. 3B:3-13 to -16; In re Santelli, 28 N.J. 331, 342-43, 146 A.2d 449 (1958).
[DeCeglia, supra, 265 N.J.Super. at 135-36, 625 A.2d 590.]
Here also, application of the principles derived from the law of wills would not assist the plaintiff. The only "evidence" of Josephine's intentions to distribute the insurance proceeds to all of her children was a vague statement by one son that Josephine will do the right thing. However, while this was evidence of the comment the son made to Josephine, because Josephine did not respond to this comment, there was no express testimony of Josephine's intention. This mere verbal expression falls short of sufficient evidence to alter the named beneficiary designation.
We note also that the trial judge did not address which party had the burden of proof on this issue. In our view the burden of proof to change the designated beneficiary of an insurance policy is upon the party seeking to upset the beneficiary designation. See Woehr v. Travelers Ins. Co., 134 N.J.Eq. 38, 40-41, 34 A.2d 136 (Ch.1943) ("... one who makes claim to the insurance moneys by virtue of an alleged change of beneficiary must carry the burden of proving that the substitution was permitted by the policy and that the change was made in strict compliance with the terms of the policy"). Here, neither the judge in the liability trial or the judge in the damages trial made any express findings why the designated beneficiary should not receive the insurance proceeds. As noted above, the meager evidence on this issue presented by plaintiff was insufficient to establish that Josephine intended Joan to hold the insurance proceeds for all of Josephine's children. Moreover, Joan's belief *1027 that her mother intended her to pay the funeral expenses from the insurance proceeds does not provide the required proof to counter the named beneficiary designation.
Simply stated, the record is barren of sufficient proof, written or otherwise, that Josephine intended to change her beneficiary.
It was error for the judge to conclude that the insurance proceeds and pension benefits payable to Joan as the named beneficiary should be included as part of Josephine's estate.

III
Except for some minor errors in the judge's computations, we find no merit to defendants' remaining contentions. R. 2:11-3(e)(1). On remand, the trial judge should recalculate the figures and make any minor adjustments required.

IV
In the cross-appeal plaintiff contends the trial judge erred in failing to apply a rate of interest to the funds held by defendants over the twenty-year period. In his decision, the trial judge expressed his dissatisfaction with the proofs presented regarding applicable interest rates and decided not to apply any interest to the damages owed except for interest that would accrue from the filing date of the complaint. The trial judge found that plaintiff's proofs did not substantiate a history of consistent investment that would merit a specific rate of interest. Consequently, he rejected plaintiff's claim for interest. Based on our careful review of the record, we find no abuse of discretion to warrant our interference in the trial judge's decision to reject plaintiff's claim for prejudgment interest.

V
Plaintiff also contends the $23,928.00 figure used by the trial judge erroneously excluded decedent's Social Security payments in 1989 and 1990. As plaintiffs explained at trial, the Social Security Administration only retained a record of Social Security payments for the last six preceding years. At the time of trial, figures from the Social Security Administration regarding Social Security payments received by decedent only dated back to 1991. Thus, the stipulated amount for Social Security benefits totaled $23,928, but did not include benefits received in 1989 and 1990. Plaintiff's expert, Suozzo, noted that decedent's tax returns between 1989 and 1993 more accurately reflected the amounts decedent received from Social Security than the amount which the parties had stipulated to, which did not include checks received in 1989 and 1990. According to decedent's tax records for 1989 and 1990, decedent received $6,784.00 in benefits in 1989 and $7,672.00 in 1990. Plaintiff offered copies of decedent's tax returns from 1989 and 1991 as proof of such Social Security payments. However, Suozzo included a total of $30,871 for Social Security payments in his spread sheet.
If the Social Security payments received by Josephine totaled $30,871, then plaintiff's additional claims would appear to be only $6,943 ($30,871 minus $23,928).[3] On the other hand, if the $23,928 for Social Security benefits allowed by the trial judge did not include the $14,456 for the years 1989 and 1990, then plaintiff's additional claim would be for $14,456. On this record, we are unable to discern which is the correct amount. In any event, we are convinced the judge intended to include the Social Security payments reflected on the tax returns for 1989 and 1990. However, we cannot be sure whether both years were included. Thus, a remand is necessary to reconsider the amount of Social Security payments to be included with the corresponding adjustment to the expenses to be deducted.

VI
In summary, we reverse the portion of the judgment that awarded the insurance proceeds and the amount of the pension benefits *1028 to plaintiff. We remand for reconsideration of the amount of Social Security payments to be included and for recalculation of the judgment. In all other respects we affirm. We do not retain jurisdiction.
NOTES
[1] The trial judge's calculation of net total revenue is off by $1.00. The net wage amount should be $240,217.57 instead of $240,216.57, therefore the net revenue amount should be $383,054.47 instead of $383,053.47.
[2] We believe there are minor errors in the calculations based on figures discussed in the trial judge's decision, the one-third deduction for decedent's personal expenses from decedent's aggregate disposable income should have been $80,610.57 instead of "$80,593" to yield a net damage award of $161,219.90.
[3] Following oral argument, in a letter dated November 12, 1998, plaintiff attempted to clarify that the amount of the additional claim in Social Security benefits was $6,982.00, rather than $14,456.00. Plaintiff claimed that the total amount of Social Security benefits paid to Josephine was $30,910.00 which is in variance to plaintiff's expert's total of $30,871.00.